## W. A. DOUGLAS v. STATE.

No. A-3735. Opinion Filed July 20, 1921.
(199 Pac. 927.)

(Syllabus.)

1. **Rape—Evidence Supporting Conviction.** In a prosecution for rape in the first degree, evidence reviewed, and held insufficient to support the verdict and judgment of conviction.

2. **Rape—Insufficiency of Uncorroborated Evidence of Prosecutrix.** Under the laws of this state, conviction for rape may be had upon the uncorroborated evidence of the prosecutrix; but where the testimony of the prosecutrix is contradictory, and her reputation for truth and veracity is impeached, and the defendant testifies, and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction.

3. **Witnesses—Impeachment—Contradictory Statements out of Court.** In a prosecution for rape, the credibility of the prosecutrix may be impeached by proof that she has made statements relevant to the issues, out of court, contrary to what she has testified to on the trial.

4. **Same—Contradictory Statements in Writing.** Where a witness has made statements in writing, different from those made on the trial, and the statements are shown the witness, who admits having made them, and witness is given an opportunity to explain them, they may be read in evidence for the purpose of impeachment.

5. **Evidence—Self-Serving Acts and Declarations, not part of Res Gestae, Inadmissible—Not Incumbent on Defendant to Show Some Other Person Guilty.** A defendant cannot introduce evidence of his own self-serving acts and declarations, not constituting a part of the res gestae, and is not bound to make an effort to show that some other person is guilty of the crime for which he stands charged, at the peril of furnishing by his failure to act or by his silence, evidence against himself when on trial upon the charge, and the admission of such evidence over his objection constitutes error.

6. **Witnesses — Appeal and Error — Interrogation of Witnesses by Trial Judge—Abuse of Discretion.** While it is the right of a trial judge to interrogate witnesses, when essential to the adminis-

19—C. R. 9

tration of justice, yet the practice of so doing, except when absolutely necessary, should be discouraged, and when it appears that there was an abuse of discretion by the trial court in interrogating different witnesses during the trial of the case, which was prejudicial to the substantial rights of the defendant, the judgment of conviction will be reversed.

Appeal from District Court, Seminole County; Geo. C. Crump, Judge.

W. A. Douglas was convicted of rape in the first degree, and he appeals. Reversed.

Fowler & Wilson and Wm. A. Collier, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment of conviction for rape in the first degree and sentence in accordance with the verdict of the jury for the term of 15 years in the penitentiary. The information charges that in Seminole county, on or about the 1st day of October, 1910, the defendant, W. A. Douglas, accomplished an act of sexual intercourse with one Jessie McKinley, a female under the age of 14 years and not the wife of the said defendant.

The errors assigned are substantially as follows: That the verdict of the jury was contrary to the law and to the evidence; that the court erred in the admission and rejection of certain evidence, and in refusing to give certain instructions.

The Attorney General in his brief states:

"That the evidence is not sufficient to uphold the verdict of the jury and the judgment of the court."

The state relied for this conviction upon the testimony of Jessie McKinley, who testified as follows:

"I live with Mr. Charles G. Putney, superintendent of the Home near Oklahoma City. I have been in his charge for about 4 years. My mother is dead. I don't know whether my father is or not. I came to live in Seminole county with the defendant the 20th day of September, 1918. He came and got me to be one of his family. We got off the train at Shawnee and then drove in a wagon to his house. My age is 13 years from April 20, 1918. I started to school on the 4th day of December, and I quit the latter part of April, 1919. I was pregnant at that time. The next week after I went to his house, it was on Friday, the defendant had sexual intercourse with me and he had sexual intercourse once and sometimes twice a week until December 4, 1918; that was the last time. My baby was born on the 23d day of June, 1919, and W. A. Douglas is the father of my child. I am not his wife. He told me his age was 55, the 4th day of April, 1919."

On cross-examination she testified:

"I lived in a covered wagon with my father after mother died. He traveled from place to place and bought junk. I ran off from my father, because he did not treat me right, and the court at Oklahoma City placed me with Mr. Putney. I stayed there about 6 months, then stayed with my aunt in Oklahoma City 6 months, and then went back to Mr. Putney's. I stayed there about a week, and went to the home of Mr. Bryan Gosby, at Norman, and stayed there about 3 weeks; then he took me back to Mr. Putney's. I stayed there about 3 weeks; then I went to the Tutch sisters near Yukon. I stayed with them a month to a day. Mr. Putney came after me. About two weeks later Mr. Hurschburger came to the Home and picked me out and took me to Skedee. I stayed there a little over a month, and he took me back to Mr. Putney's. Next I went to my uncle's in Oklahoma City, stayed there a month and a half, and returned to Mr. Putney's. On January 6th, I went to Mr. Ben Bennett's; he was a married man, 60 years old, with a wife and 13 children. I stayed until late in May. I had sexual intercourse with Mr. Bennett only once while I was there. From there I went to my aunt's, and then to Mr. Putney's; then I went to Mrs. Lynch's Orphan Home on Main street, Oklahoma City. I stayed a little over a month; then Mr.

Landreth took me to Centrahoma. I stayed there about a month, and he brought me back to my aunt's. I did not have intercourse with any one while I was there. It was after I was with Mr. Douglas that I said Mr. Landreth had had intercourse with me.

"By the Court: Why did you make it? Because W. A. Douglas threatened me. What did he say to you? 'Now Jessie, I want to tell you one thing: If you say I was the one that had intercourse with you, I will kill you.' And his wife said, 'Yes; I will, too.' I did not say anything about Mr. Douglas threatening me when I testified at the first trial. I did testify that I told Mr. Putney the first time Mr. Landreth had intercourse with me, because I did not like Mr. Landreth, and he treated me mean; that is what I testified, but it was not so. When they took me to Seminole, I told them that Mr. Landreth was the cause of my condition. I did not make any affidavit there.

"By the Court: Did you sign any paper with writing on it? A. Yes, sir; I did. They asked me, and I said Ben Bennett, Mr. Landreth, and Ed Hawkins were the only persons who had ever had intercourse with me; then we went to Wewoka, to the county attorney's office, and I made an affidavit there. I did not accuse Mr. Douglas at that time. I was there 3 days; then they sent me to the Home of Redeeming Love at Oklahoma City. While there I wrote five or six letters to Mr. Douglas. (Here witness identifies said letters.) I call my aunt, Mrs. Mosley, who lives in Oklahoma City, Aunt Lottie. I talked to her when I returned, and told her that Mr. Landreth was the cause of my condition. Mr. Douglas treated me well while I was there, and he got the things I wanted; but he whipped me two or three times for being late coming from school, and I wanted to go to town sometimes, and he would not let me go to town. I didn't like that. At the preliminary examination on the 30th of July, I was asked to state my age, and my answer was 14 years the 20th day of April. I did not say 14 the 20th of last September. Ed Hawkins lived a quarter of a mile from Mr. Douglas. His age was 14 years. It was about a month after I went there before I met him. I did not tell

Mrs. Douglas, 2 or 3 days after I got there, that I met Ed Hawkins down at the mail box and he insulted me. It was about a month after I got there before that happened. At that time Ed Hawkins asked me to let him have intercourse with me. I did have intercourse with Ed Hawkins. Mr. Douglas objected to my going with Ed Hawkins. It was in January that Ed Hawkins had intercourse with me; I mean the last of February. I was not with Ed Hawkins about a week after I went to Mr. Douglas' house in the woods. I know Mr. Rutherford, and I did not see him ride by that pecan thicket. I was not there with Ed Hawkins. I often came part of the way home from school with Ed Hawkins. I am positive that it was the next Friday after I got there that Mr. Douglas had intercourse with me. It was in the barn in the hay mow, and the next time was about a week later. The last time was the 4th of December, in the afternoon, in my room. Mrs. Douglas was at Mrs. Hulsey's. I was there a month when Mrs. Douglas gave me Wine of Cardui, and I took a tablespoon of worm medicine; it was called 'Male Fern.' Mr. Douglas never talked to me about my being with baby, and I never told him my monthlies had stopped. Mr. Douglas came twice to the Orphans' Home to see me, and he talked about this case. He said would not be papa any more after we went to court, and he told me to write to him and Mrs. Douglas, giving all the news.

"By the Court: Jessie, you say Mr. Douglas was good to you while there? A. Yes, sir; one way he was, and one way he was not. Q. Are you mad at Mr. Douglas? A. Yes, sir. Q. Why? A. The way he treated me. Q. Do you know what will become of you if you swear a story? A. Yes; I would go to the Reform School. Q. If you swear a story on this man, you know it would put him in the penitentiary? A. Yes, sir. Q. Do you think he ought to be? A. I think he ought to be. I think he treated me mean enough to be. Q. Do you want him to go to the penitentiary? A. Yes, sir. Q. Why do you want him to go to the penitentiary? A. Because he treated me like he did. Q. He was good to you every way? A. He was good to me, except to go to town. I was not at town but three times all the time I was at his place. Q. And if you would tell a story on Mr. Douglas,

don't you know that would be awful wrong? A. Yes, sir.. Q. Do you believe in a spirit being? Do you believe in God?' A. Yes, sir; I do.    Q. Do you believe he would ever forgive you if you told a story on Mr. Douglas? A. No, sir; he would. not. I don't believe he would if I told a story.''

Bert F. Meyers testified:

''I was teaching school last winter at what is commonly called Jarvis Township school.    Jessie McKinley attended said school, which commenced on the first Wednesday in. December, 1918.    Ed Hawkins also attended said school.''

George W. Douglas testified:

''I am not related to the defendant.    I am a member of the school board of Jarvis school.    Last spring I heard of the condition of Jessie McKinley, and with Mr. Wright and Mr. Huff went to the county attorney and asked for an investigation of the matter.

''By the Court: Was it very noticeable that she was pregnant? A. Yes, sir.    Q. Did Mr. Douglas take steps to have an investigation himself, or did you have it made? A. Us three made the investigation. Q. He took no steps to have the matter investigated? A. Not to my knowledge.''

On cross-examination he stated:

''I am not very friendly towards Mr. Douglas, and Mr. Huff lacks a whole lot of being friendly with him.    Ed Hawkins is a stepson of Mr. Huff.''

A. F. Polk testified:

''I am deputy sheriff.    About the 1st of May the county attorney directed me to go and get the defendant and the little girl and bring them to town.    I found the defendant. plowing corn, and told him what I came there for.    He said. the little girl was gone to school up to the Jarvis schoolhouse, about two miles and a half, and I will take the team and go and get her.    I says: 'No; we will go up there by the schoolhouse for her, and all go into town.'    We went by the schoolhouse and got the girl. Mr. Deheart rode with me in the front seat, and the girl and Mr. Douglas in the back seat.    They were talking, but I did not hear Mr. Douglas tell

her to lay this on Mr. Landreth. The girl denied that she was pregnant, and we had Dr. Turlington examine her. The defendant stated that he did not know that she was pregnant.''

On cross-examination he stated:

''I was present when she admitted being pregnant.''

He was then asked:

''Q. Did you hear her say at that time who was the cause of her being in that condition?

''By the Court: ''That would be hearsay. You can ask her if she denies it; then prove she said it.''

The state rested, and the defendant moved the court to direct a verdict of acquittal, for the reason that the testimony of the prosecutrix is contradictory, uncorroborated, and insufficient upon which to base a conviction, which motion was overruled and exception taken.

For the defendant, J. H. Landreth testified:

''I live at Centrahoma. My age is 65 last March. I became acquainted with Jessie McKinley about the 4th of June last year, at which time Mr. Putney went with me to her aunt's and I took her home with me. On the 8th day of August, a year ago, I took her back to her aunt's.''

He was then asked:

''Q. After you returned her to Mr. Putney, was any charge filed against you? (The state's objection sustained). Q. Well, state whether or not you was arrested on any charge? A. Yes, sir; (Same objection. Sustained, and answer stricken.)''

Jack Rutherford testified:

''I live near the Jarvis schoolhouse. I know about the time Jessie McKinley came to live in the defendant's home. About a week later I was riding by the defendant's place, and saw Jessie McKinley and Ed Hawkins west of the defendant's house, near the line between the land and Tom Bruner's. They were standing near the fence row, among

some pecan trees. It was in September, and about the middle of the afternoon."

Three or four witnesses, including her school-teacher, testified that they knew the reputation of prosecutrix for truth and veracity in that community, and that it was bad. Seven or eight witnesses testified that they knew the defendant's reputation in that community for the past six years as to being a moral, upright, law-abiding citizen, and that it was good.

Dr. Harrison testified that he was state health officer of Seminole county, that "Male Fern" is a vermifuge; that Wine of Cardui is known as female tonic, and is not used as abortion medicine.

Dr. M. M. Tarleton testified:

"I have held the position of county superintendent of health. The 2d day of May this year I examined Jessie McKinley and found that she was pregnant. At that time I had a conversation with her."

He was then asked to state what she said as to her condition. The court sustained the state's objection. The defendant offered to prove by the witness that Jessie McKinley stated to him that either Ed Hawkins or Tom Landreth was the cause of her pregnancy.

Mrs. Alice Douglas testified:

"I am the wife of defendant. Jessie McKinley was brought to our house by my husband on the 20th day of September, 1918, and remained there until the 1st day of May, 1919. During that time I took her with me among the neighbors, and to church and to Sunday school. My husband treated her just the same as he would his own child. He corrected her a few times. I didn't know that she was pregnant until after they took her away. About the 20th of October her clothes showed that she had menstruated. She did not in November. At that time I gave her some Wine

of Cardui. I thought she needed it. In March I gave her two doses of Male Fern for worm medicine."

A. C. Nichols testified:

"In 1919 I was county attorney of this county. About May 2d Jessie McKinley was at my office in Wewoka. I prepared and she signed an affidavit. The original I mailed to the county attorney at Coalgate. I have a carbon copy in the same condition it was when she signed it."

The copy was offered in evidence, and on the state's objection rejected. Among others it contained the following statements:

"On the 6th day of January, 1918, I went to the home of Ben Bennett; stayed there until about 10th of the following June. Just before I left Mr. Bennett had sexual intercourse with me three times. I went to Jim Landreth's home about the middle of September. He had intercourse with me along about the 12th or 13th of September, and again a few days later. I am now in a family way, and know that Jim Landreth is the one who got me in this condition, for he is the last man that ever had sexual intercourse with me."

As a witness in his own behalf the defendant testified:

"I went to Oklahoma City, and I got Jessie McKinley from Mr. Putney and her aunt. She remained at my home until the 1st day of May, when Mr. Polk came out and told me he had come to bring me and the girl to town, with directions not to allow us to talk to one another. We went to town with him, and I didn't see her any more until after the investigation. Then Mr. Polk took us back to my home, and she got her clothes and went away with him in the car. I did not see her again until the middle of May. She wrote a letter saying she would like to see me and Mrs. Douglas. The matron was present while I talked to her. The second or third week after I brought her home she complained to me that Ed Hawkins had insulted her. I told her that Ed Hawkins was a very bad boy, and forbade her to associate with him, and I would take her back to Oklahoma City if she did."

In response to questions by the court he stated that his information was that Ed Hawkins is now in the Reform School at Granite, having been convicted in Grady county of burglary. He further testified:

"I did not have sexual intercourse with her on that Friday or at any of the times testified to by her. I never had sexual intercourse with her. I went to Shawnee on that Friday, leaving home about 10 o'clock, and left Shawnee about 5 o'clock, arriving home about dark. I paid for a bill of lumber, and here is the receipt. (Witness produced bill for lumber, signed: 'Received payment September 27, 1918. Taylor Lumber Co., per W. B. Taylor.') I treated Jessie McKinley in every particular as a father should have done. I punished her once for being impudent to Mrs. Douglas, and twice for being very late coming home from school and telling stories about it. I don't know anything about the medicine she took. I thought my wife ought to know what was necessary. I did not know that she was pregnant until they told me at Seminole on May 1st."

The defendant again offered in evidence a letter received from prosecutrix, dated Oklahoma City, May 12th, containing statement:

"I would like to see you and papa too."

Also letter, dated Oklahoma City, May 27, 1919, in part as follows:

"Dear Mama: Papa was out here to-day and I was glad to see him. I would have been gladder to see you. Well, I told Papa that it was Edward Hawkins that did me that way; he did not do me that way at all. I did not hardly know what to say when I left there. Aunt Lottie told me to say it was you; but I know it was not you that did me that way."

The state's objections were sustained.

In rebuttal the state offered the testimony of Mrs. Anna Buck, formerly Mrs. Lynch, who testified that at the time

that Jessie McKinley was taken by the defendant she told him that Jessie McKinley had come into womanhood.

Upon an examination of the record we reach the conclusion that the judgment of the trial court should be reversed. There can be no doubt that the defendant was prejudiced by the trial court's examination of the prosecutrix, and that such examination constituted an abuse of discretion by the trial court, and was in effect a comment on the weight of the evidence. In Harrison v. State, 11 Okla. Cr. 14, 141 Pac. 236, this court said:

"While it is the right of a trial judge to interrogate witnesses, when essential to the administration of justice, yet the practice of so doing, except when absolutely necessary, should be discouraged, and when it appears that there was an abuse of discretion by the trial court in interrogating different witnesses during the trial of the case, which was prejudicial to the substantial rights of the defendant, the judgment of conviction will be reversed."

The questions propounded by the court to the witness George W. Douglas were also improper, and the answers thereto incompetent. In Morris v. State, 9 Okla. Cr. 241, 131 Pac. 731, this court said:

"A defendant cannot introduce evidence of his own self-serving acts and declarations not constituting a part of the res gestae, and he is not bound to make an effort to show that some other person is guilty of the crime for which he stands charged, at the peril of furnishing, by his failure to act or by his silence, evidence against himself when on trial upon the charge, and the admission of such evidence over his objection, constitutes reversible error."

We also think that the court erred in refusing to admit in evidence the affidavit made by the prosecutrix in the office of the county attorney. The affidavit was offered by the defendant to discredit the witness, and, being proper for such

purpose, it should have been admitted. The court also erred in refusing to admit in evidence the letters written by the prosecutrix to the defendant and his wife. The general rule is that, where a witness has made statements in writing different from those made on the trial, and the statements are shown the witness, who admits having made them, they may be read in evidence for the purpose of impeachment. The credibility of the prosecutrix may be impeached by proof that she has made statements relevant to the issues out of court, contrary to what she has testified to on the trial, and the court erred in rejecting the offered évidence as to what the prosecutrix stated to Dr. Tarleton. 1 Greenleaf Ev. (16th Ed.) par. 461.

It is also urged that the evidence is insufficient to sustain the verdict. In our opinion the Attorney General properly concedes the evidence to be insufficient. The testimony of the prosecutrix being so conflicting, when taken into consideration with her other admittedly false statements, and considering all the evidence in the case, we think this court is warranted in assuming that the jury must have rendered their verdict under the influence of passion and prejudice. Under the laws of this state a conviction for rape may be had upon the uncorroborated evidence of the prosecutrix, however, where the testimony of the prosecutrix is contradictory, and her reputation for truth and veracity is impeached, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction.

For the reasons stated, and because the evidence is insufficient to warrant a conviction, the judgment of the trial court is reversed, and the defendant discharged.

MATSON and BESSEY, JJ., concur.