## COLUMBUS EDWARD DE WITT v. STATE.

No. A-10327.    Oct. 4, 1944.

(152 P. 2d 284.)

C. H. Baskin, of Holdenville, and Bishop & Bishop, of Seminole, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Harvey Powell, Co. Atty., of Holdenville, for defendant in error.

BAREFOOT, J. Defendant, Columbus Edward De-Witt, was charged in the district court of Hughes county with the crime of rape in the first degree; was tried, convicted, sentenced to serve a term of 15 years in the State Penitentiary, and has appealed.

Defendant was charged with the rape of his 13-year-old daughter on October 31, 1940. The complaint against him was filed in the justice of the peace court on November 7, 1940. Preliminary examination was waived by the defendant, and the information was not filed in the district court of Hughes county until January 14, 1942. The record does not disclose why an information was not filed in the district court at an earlier date. It is stated in the brief of defendant, and he testified that he remained in jail for a period of ten months before he was able to make bail.

The assignments of error that the evidence is insufficient to sustain the conviction, and that the verdict of the jury and the judgment and sentence of the court should be set aside because there is not competent corroboration of the testimony of the prosecuting witness, are the only errors necessary to consider for a proper determination of this appeal.

Defendant was the father of nine children at the time of the trial: Hiram, age 22 years, Ruby 21, Odell 19, L. C. 17, Dorothy Lee (the prosecutrix) 13, Kenneth 12, J. R. 10, Edna May 8, and Earl Thomas 6 years. The mother died in 1935.

Seven of these children were living with the defendant at his home on October 31, 1940, and according to

all of the witnesses, they were present in the home on the night it is claimed defendant raped the prosecutrix. Also present were an adult aunt, and her two children, ages 12 and 8 years. In all, there were twelve persons, including the defendant and the prosecutrix, present at the time the attack is alleged to have occurred.

The testimony of the prosecutrix, Dorothy Lee, was that they were all sleeping in two rooms. In bed with her where the act occurred were her small brother and sister, ages four and six years, respectively. The father was in the adjoining room, sleeping on a bed next to the wall, with two children sleeping at the foot of his bed, and three children sleeping on a pallet by the side of his bed. The aunt and two other children were sleeping in a bed in the same room where prosecutrix was sleeping with her small brother and sister. According to her testimony, the father came to her bed and had an act of intercourse with her, and none of the other parties who were sleeping in the house at the time were awakened or knew anything of the attack being made. She also testified that these acts had been going on for a period of two years, sometimes in the daytime while the children were playing in the yard, and sometimes in the night when they were all in the house. Ruby, the oldest daughter, had married in 1938, and was not at home at the time these acts occurred. Prosecutrix further testified that during the fall of 1940 she and the other children went into Holdenville to visit her grandfather, and while there her married sister, Ruby, came to see her, and after being questioned by her, she for the first time told her of what had occurred. Her sister took her to Dr. A. L. Davenport for an examination. This was in 1940. She then took her to the county attorney of Hughes county, and charges were preferred against the defend-

ant, charging him with the rape of Dorothy Lee on October 31, 1940.

In an attempt to corroborate the testimony of the prosecutrix, the state placed upon the witness stand Dr. A. L. Davenport. The material part of his testimony was that the sister of prosecutrix brought her to his office for examination in the early part of November, 1940. That she gave him a history of her case, and told him that she had been having intercourse with her father. That his examination revealed that her hymen had been ruptured; that she had been having intercourse for a long time; and that two fingers could enter her vagina without causing pain. He testified as follows:

"Q. Do you recall how come her to be at your office? A. Well, her sister brought her to the office and said she wanted me to examine her; that her and her father had been having intercourse, according to the history that the girl gave her. She wanted me to examine her and see whether she had ever had intercourse or whether at the time I could determine she—if she was pregnant or not. ... Q. Tell the jury what kind of an examination you made, Doctor, and what you found. A. I examined her and went into the history. She claimed up to this time she never had menstruated, and she wasn't very well developed. Mr. Baskin: I didn't get the answer, Doctor. A. I say she wasn't very well developed for a girl of 13 is generally developed, where we break it in, what the medical understands as the vaginal examination, the exterior and interior examination, and I told her sister at that time, from my examination, that I didn't think she was pregnant; if she was, she wasn't very far advanced, but, on the other hand, that she had had intercourse. It wasn't any trouble whatever to introduce two fingers in the vagina. Q. Now, Doctor, tell the jury what you mean by 'not being well—very well developed? A. Well, by that, the hair wasn't very well developed and her breast wasn't very well developed. What I mean by that, she didn't have

the development that lots of girls would have for that age. Lots of girls are developed almost complete woman at 13 and 14 years old, while some girls are not practically developed at all. They assume no difference under that age. She was more, say, on the border line. That is, when I examined her. Q. Doctor, did you find any fragment of the hymen? A. Well, there wasn't a hymen there. The hymen had been ruptured and gone. Q. You say you had no trouble in introducing two fingers? A. No, sir; no, sir. Q. Could you tell she had had sexual relations with somebody, or not? A. I told her sister when I got through that she had been having sexual relations with someone. Mr. Baskin: I object to what she told her sister. A. Well, I told her and her sister together." . . .

And on cross-examination he testified:

"Q. Does medical science teach you that some women are born without a hymen? A. The medical sciences teach some women are born without a hymen and some women are born with an imperfect hymen. Have different conditions existing in the hymen. But of course by an accident or a case like that, the hymen can be ruptured. Otherwise, about always some fragment left to show where there had been a hymen, where it had been ruptured. Q. Was there any fragments here? A. Yes, sir. Q. You say she wasn't very well developed in her breast, was she? I will ask you if it isn't a fact that any woman who has been engaging in sexual intercourse doesn't ordinarily develop her now in the breasts? A. I don't know whether that would have anything to do with it whatever. Q. You don't think it would? A. I don't know that it would. Q. You said, I believe, that it is no trouble to insert two fingers in the womb? A. Not in the womb; in the vagina. Q. In the vagina? A. Yes, sir. Q. And that would indicate that she had been having sexual intercourse, you say? A. It would indicate that she was capable of having sexual intercourse, or that something previously had ruptured the hymen."

With this testimony the state rested, and the defendant offered a number of witnesses, including himself.

Hiram DeWitt, the oldest son, age 22 at the time of the trial, and who was married and had two children, testified that he had lived with his father and mother until the death of his mother in 1936, and with his father and the children until 1938, when he married. He gave a complete history of the family, and testified that the eldest daughter, Ruby, was high-tempered and both before and after her mother's death administered whippings and beatings to the smaller children, and used abusive language toward them, which it is unnecessary to repeat. He testified to her running away from home and going to Oklahoma City, and of her father going after her, and taking her home; of her starting to follow the witness and another man down to the woods when her father had forbade her going, of her father overtaking her and whipping her and taking her back home; that she made the statement at that time that if her father whipped her "he would regret it the rest of his days;" of her marriage; that she left home a short time thereafter and her return after two years absence, and coming to the home of witness with her husband; of their going to the home of his grandfather in Holdenville and Ruby talked with Dorothy Lee, the prosecutrix, who with the other smaller children were visiting there, of her taking Dorothy Lee to the sheriff's office, and of going to the county attorney's office and having charges filed against the defendant and of his being placed in jail; that Ruby and her husband returned to their home in Prue and took Dorothy Lee and Edna May with them. There was also introduced in evidence a letter written by Ruby to this witness, addressed to him at Calvin, Okla. He lived at or near Holdenville. It was marked "personal," and in it she asked that he tear it up when read. In this letter she asked that certain personal property be sent to her. Both he and his father, the defendant, testified that

this property did not belong to her, and was therefore not sent to her. He further testified that Dorothy Lee, the prosecutrix, had for a number of year prior to 1940 suffered from "oesto-myelitis," which was commonly called "T. B. of the bone." That she was in a hospital in Oklahoma City for about four years, and that her leg was in a cast from the foot to the hip for about six months. It remained in this cast when she was taken to her home. That she had undergone about 13 operations while in the hospital. She returned to her home during the year 1939. He also testified that defendant was a hard-working man, spent every dollar he earned for the benefit of his family, and that he never at any time saw the defendant in any way mistreat any of the children. He also testified to numerous other facts which completely explained evidence of statements made by the prosecuting witness.

Bernice Costa, a niece of defendant, testified that she was at the home of her grandfather when Ruby and her husband came there in November, 1940. That Ruby went to the room of Dorothy Lee, the prosecutrix, and she heard Ruby "ask Dorothy if she would, and she said she didn't want to." She did not know what they were talking about, and this was all of the conversation that she heard. She also heard Ruby and her husband tell her grandfather that Uncle Ed (the defendant) had sent after the children. They took them away, and Dorothy Lee and the smaller girl, Edna May, went to the home of Ruby Horton and never returned to their father's home.

Odell DeWitt, age 19 at the time of the trial, testified that he was at home on the night of October 31, 1940. He testified to the arrangements of the house, and how the 12 parties slept therein on the night of October 31st. He and one of his brothers, L. C., and a cousin went to the

home of a neighbor to see some boys. The boys were not at home, and all returned between 7 and 8 o'clock. They played a fiddle and a guitar. All of the children went to bed about 10 o'clock and so did the defendant. Witness and his brother L. C. played the fiddle and guitar until about 12 o'clock. They then went to bed on a mattress that had been taken from his father's bed and placed on the floor by the side of the bed, but they talked and played until about 2 o'clock. At no time did he hear or see his father leave his bed, or go toward Dorothy Lee's room. They awoke about 5 o'clock in the morning. He testified as to the abusive treatment of his sister Ruby toward the small children, and of her striking and whipping them, and of her high temper. That he never at any time saw the defendant mistreat his daughter Dorothy Lee. He corroborated the evidence of his brother Hiram as to the sickness of Dorothy Lee and upon other material points which it is unnecessary to relate.

L. C. DeWitt, age 17 at the time of the trial, testified that he was present in the home of defendant on the night of October 31, 1940. He corroborated in every way the testimony of his brother Odell.

Kenneth DeWitt, age 12 years, testified to the kind treatment of his father toward all of the children, and of the ill treatment they received from their sister Ruby.

J. R. DeWitt, age 10, testified he was in the third grade, and that his father always treated the children "fine."

Thomas DeWitt, age 6, was placed upon the stand but because of his tender age no material questions were asked him.

The defendant offered as a witness Dr. W. E. Floyd of Holdenville. He had practiced medicine 39 years in

Hughes county, and was county health officer. It is unnecessary to unduly lengthen this opinion by giving all of his testimony. He testified that in some instances women are born without a hymen, and that when the hymen is ruptured that after a few hours it is impossible to tell that it was caused by the penetration of the male organ. That it can be ruptured by instruments, and in other ways, which he fully explained.

There was also introduced in evidence the discharge of the defendant from the United States Army. This showed his induction on June 23, 1918, and his discharge on July 2, 1918, by reason of "ideopathic epilepsey." This disease was fully explained by Dr. Floyd, and the evidence revealed that the defendant had had several attacks since being discharged from the army.

Evidence of witnesses from Holdenville and Horn Town where defendant had resided for many years, as to his good reputation and never having before been arrested or charged with crime, was introduced by defendant.

The deposition of H. V. Deming was offered. He testified that on the date defendant was placed in jail, Willie Horton, the husband of Ruby Horton, told him that "Ed (the defendant) was in jail, and that he (Willie Horton) intended to bring about the arrest of the other children, that is, the sons of this defendant, and cause them to remain in jail or be placed under a peace bond."

The defendant took the witness stand and denied the charge made against him by his daughter Dorothy Lee; of the trouble he had with his eldest daughter Ruby, and of his going to Oklahoma City and finding her living in undesirable conditions and surroundings; of bringing her back home; of her attempt to associate with men of whom he did not approve; of his whipping her upon one occasion,

and her threat to get even with him; of her demand for certain personal property and household goods after her marriage and which she did not own; of her absence for a period of two years after her marriage without writing or communicating with him except the one letter written to his son Hiram in which she stated that he (defendant) would be an unwelcome guest in her home and advising Hiram not to bring him to her home; to the illness of his wife and his child Dorothy Lee, the prosecutrix; of his devotion to her and the other children; of his struggle to make a living working for $1.50 and $2 a day in order to make enough to keep his family together; of his being kept in jail for a period of ten months and of the scattering of his family during this time; and his re-establishment of his home after his release. He testified he had no ill will toward Dorothy Lee, the prosecutrix, and that he was of the opinion she had been persuaded to testify against him by his eldest daughter and her husband.

On rebuttal the state offered T. G. Lankford as a witness, who testified that he was the uncle of defendant's wife. He recalled having passed the home of defendant either in 1939 or 1940. That he saw the children in the yard playing and that he stopped and went to the back door. That the screen was latched and that defendant and Dorothy Lee were in the kitchen. That the other children were in the yard playing. That Dorothy Lee answered his knock in a minute and opened the door. He saw nothing wrong in the conduct of the defendant or Dorothy Lee.

With reference to the law applicable to cases of this character, this court has in many cases fully considered and discussed the same. We have adhered to the principles that have been announced in the early days of this court,

and the late decisions have cited and quoted fully from those decisions. The Attorney General in his brief has cited three of these late decisions: Weeden v. State, 73 Okla. Cr. 258, 120 P. 2d 379; Varner v. State, 69 Okla. Cr. 294, 102 P. 2d 615; and Jackson v. State, 77 Okla. Cr. 160, 140 P. 2d 606. These cases cite all of the early cases and they will not be here repeated. We have carefully read the three cases above cited. The facts in those cases are materially different from the facts in the instant case.

In the Weeden Case the defendant was charged with the rape of his 14-year-old daughter. The evidence of the prosecutrix was corroborated by the members of the family and many other persons, and it was shown that he had many opportunities to commit the act when no one was present. This was brought about by his own arrangements. The evidence further revealed that he had served three different terms in the penitentiary. In the instant case, all of the members of the family contradicted the evidence of the prosecutrix. He had no opportunity and sought none. He was with the prosecutrix only when his family was present or in close proximity.

In the Varner Case, the act was by force and not by consent. The prosecutrix told her mother and father of the act immediately upon her return home by the defendant. They corroborated her testimony and testified to her personal appearance, and the condition of her clothing. Her testimony was in no way contradicted, except by the defendant himself.

In the Jackson Case, the rape was by force and the prosecutrix was 33 years of age. The prosecutrix left the defendant at the very first opportunity, and told the officers. Her testimony was uncontradicted and unimpeached, and there was nothing to show that it was un-

reasonable or untrue. The defendant's testimony was contradicted by witnesses he placed upon the stand. It was further revealed that he had previously served a term in the penitentiary.

One of the most recent cases decided by this court, and which would come nearer sustaining the contention of the state as to the corroboration of the prosecutrix, is the case of Maxwell v. State, decided on April 12, 1944, and reported in 78 Okla. Cr. 328, 148 P. 2d 214, 217. In that case we have reviewed all of the early decisions of this court and have in concise language stated the law in this jurisdiction as has so often been repeated in the decisions of this court. We there said:

"From an early date this court has adopted the rule that one may be convicted upon the uncorroborated testimony of the prosecutrix. Morris v. State, 9 Okla. Cr. 241, 131 P. 731; Douglas v. State, 19 Okla. Cr. 257, 199 P. 927; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Harris v. State, 27 Okla. Cr. 405, 228 P. 525; Day v. State, 29 Okla. Cr. 49, 232 P. 122.

"But we have limited this rule with an exception which is as well established as the rule itself. It is that the testimony of the prosecutrix in a rape case must be clear and convincing, and where it bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it will be held as insufficient, and under these circumstances must be corroborated to the extent of making it sufficient. Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246; Gordon v. State, 75 Okla. Cr. 356, 131 P. 2d 503; Weeden v. State, 73 Okla. Cr. 258, 120 P. 2d 379; Burtt v. State, 64 Okla. Cr. 68, 77 P. 2d 580.

"This rule has more often been applied in cases where the prosecutrix is a child of tender years and more susceptible of coming under the influence of others, or through

fear, threats, coercion or duress. Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; Woodruff v. State, 74 Okla. Cr. 289, 125 P. 2d 211.

"In the Weston case, supra [Weston v. State, 77 Okla. Cr. 51, 138 P. 2d 553], reference is made to the Sowers case, supra [Sowers v. Territory, 6 Okla. 436, 50 P. 257], which is based upon the reasoning of Sir Matthew Hale, one of the greatest judges of criminal law of all times. The general rule, and the one recognized and followed by this court, is that where there is any evidence to support the verdict, or where the evidence is conflicting, the appellate court will not examine the record for the purpose of ascertaining or determining the weight of such evidence and the verdict approved by the trial judge will be permitted to stand. But in cases of this character, an exception is recognized to the general rule above stated, and that exception is that in rape cases the appellate court will make a careful examination of the whole record to the end that it may justify the sentence imposed. This exception is based upon the firm foundation announced by Sir Matthew Hale when he said: 'It is true that rape is a most detestable crime, and therefore severely to be punished, with death; but it must be remembered that it is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused, though never so innocent.'

"In the Weston Case, the judgment and sentence was reversed. We there said * * *:

" 'This is what we mean when we say that cases of this character should not be decided upon technicalities, based upon a fixed policy that the verdict of the jury is final and absolutely correct on every proposition of fact. The doctrine that one may be convicted on the uncorroborated testimony of the prosecutrix has an exception to the rule that is as well founded as the rule itself, and that is that where her testimony is contradictory, uncertain, improbable or she has been impeached, her testimony should then be corroborated. And this corroboration should be

of such dignity as to give it weight with the jury upon the question that the actual crime has been committed. It should not be such slight circumstances as to leave the court and jury to guess or speculate that the crime has been committed and that the defendant is guilty. Many cases of this nature that come before this court for review are of such character that there can not but be a doubt as to the guilt of the defendant, and the least action upon the part of the court or the slightest incompetent evidence causes the jury to return a verdict of guilty.

" 'The conviction for first degree rape carries with it a minimum punishment of fifteen years in the penitentiary, and a maximum punishment of death or life imprisonment. Certainly there is reason for the rule that has been so long adhered to by this court that close scrutiny will be given to the evidence before a conviction will be permitted to stand.

" 'In the past few years numerous rape cases have been affirmed by this court: Roberts v. State, 31 Okla. Cr. 103, 237 P. 148; Lane v. State, 48 Okla. Cr. 84, 289 P. 357; Lynch v. State, 42 Okla. Cr. 415, 276 P. 501; Fowler v. State, 42 Okla. Cr. 300, 275 P. 655; Malone v. State, 40 Okla. Cr. 102, 267 P. 486; Allen v. State, 35 Okla. Cr. 64, 248 P. 655; Harris v. State, 27 Okla. Cr. 405, 228 P. 525; Varner v. State, 69 Okla. Cr. 294, 102 P. 2d 615. Others have been reversed: Morris v. State, 9 Okla. Cr. 241, 131 P. 731; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Douglas v. State, 19 Okla. Cr. 257, 199 P. 927; Davidson v. State, 57 Okla. Cr. 188, 46 P. 2d 572; Johnson v. State, 52 Okla. Cr. 397, 5 P. 2d 772; Dawes v. State, 34 Okla. Cr. 225, 246 P. 482; Woodruff v. State, 74 Okla. Cr. 289, 125 P. 2d 211; Miller v. State, 65 Okla. Cr. 26, 82 P. 2d 317; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Kilpatrick v. State (75 Okla. Cr. 28), 128 P. 2d 246; Coppage v. State [76 Okla. Cr. 428], 137 P. 2d 797 * * *.

" 'We realize the disadvantage the trial courts are put to in the trial of this class of cases. There is generally strong feelings in the community by reason of the nature

of the crime, and often of the persons involved. These charges are often the outgrowth of alleged attacks upon children of tender age. The facts are often given wide publicity in the local communities. If a verdict of guilty is rendered by the jury, the only relief that can be given by the trial court is the granting of a new trial at a great expense to the county. In the appellate court we have an opportunity to survey the whole record, after it has been reviewed and briefed by attorneys for both the State and the defendant. It is no pleasant task to reverse a rape case, and it is no pleasant memory to send a man to the penitentiary even for a minimum of fifteen years when there is grave doubt of his guilt, and by evidence of one whom the laws require to be corroborated, and the corroboration is not sufficient. But our sworn duty demands that the laws be followed, and that justice shall prevail.'

"With the sound principles of law as above stated, and as followed by this court since its existence with few exceptions, where the general rule of sustaining the verdict and judgment when there was any evidence to support it, has been applied to cases of this character, we now consider its application to the facts as they exist in the instant case."

In the Maxwell Case, the judgment was affirmed and on as slight evidence as any case we have examined. Yet, the facts in that case are much stronger to corroborate the prosecutrix than in the instant case. Here there is no evidence except that of Doctor Davenport. Some of his evidence is contrary to the evidence of Doctor Wolf, and contrary to that of many doctors who have testified in cases which have been appealed to this court. The testimony of the prosecutrix is not only highly improbable, but is contradicted by all of the witnesses old enough to testify who were in the house at the time of the alleged offense, with the exception of one, the aunt, who the record reveals died prior to the trial of defendant. How the defendant could have left his bed with two boys sleeping at

his feet in the same bed, and passed over three other boys sleeping on a mattress by the side of his bed, opened the door and raped the prosecutrix, 13 years of age, while two other children were sleeping in the bed with her, and while a grown woman and two children were sleeping in the same room, and none of the parties awake, and no outcry on the part of the prosecutrix, is almost beyond the comprehension of the human mind. No defendant's liberty should be taken from him upon the evidence revealed by this record. The evidence with reference to the attitude of his daughter Ruby toward him, and of ill feeling of both she and her husband toward him, is unanswered as far as this case is concerned.

This charge for some reason not revealed by the record was not tried until a period of two years had elapsed. The information in the district court was not filed until two years after the commission of the offense as alleged. Certainly this case comes within the rule that the testimony of the prosecutrix should have been corroborated, and that the evidence in the record is insufficient to corroborate her in the manner provided by law.

We are, therefore, of the opinion that the judgment of the district court of Hughes county should be reversed and the case remanded, and unless the county attorney has other evidence which he considers sufficient to convict the defendant, that he be discharged. It is so ordered.

JONES, P. J., concurs. DOYLE, J., not participating.