Theodore RHAMY, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12406.

Criminal Court of Appeals of Oklahoma.

Feb. 13, 1957.

A. J. Schott, Stillwater, for plaintiff in error.

Mac Q. Williams, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Plaintiff in Error, Theodore Rhamy, hereinafter referred to as defendant, was charged by indictment filed in the district court of Payne County with the crime of rape in the first degree, was tried before a jury, convicted and his punishment fixed at fifteen years, in the state penitentiary. The case is here on appeal.

Interesting to state is that the sentence imposed was the minimum for the crime charged. The girl involved lacked less than two months of being fourteen years of age. And of course, if she had been of that age, the punishment, under the evidence developed, might have been as low as one year imprisonment. 21 O.S.1951 §§ 1114, 1116.

The facts developed are quite bizarre. The defendant, though his age is not shown (except one witness guessed it to be about 53), was not a youth, but a man with ten living children, and one deceased child. He had suffered an industrial accident in 1935, and received some compensation, but had received aid for dependent children off and on since 1935. He had once served a short term in the Oklahoma State Penitentiary on a check charge. The living conditions of the family left much to be desired. The children at home were six in number, ranging from grammar school age to seventeen years. The home consisted of one room downstairs, which served as bedroom, living room, etc., and one room upstairs. There was a kitchen and bath attached. All six children slept upstairs, but had to go outside the house to get upstairs. Apparently the only heat was from a wood and coal burning stove downstairs. On November 10, 1955 the stove was not working—the house was cold. The wife had some time before undergone a major operation. A ten year old daughter was then suffering from asthma and respiratory trouble. The defendant was still suffering

from his back injury. Truly this presents a field for sociological study.

On November 9, 1955 the defendant and his wife were called to Enid on account of the condition of a married daughter, scheduled to give birth to a child. Their seventeen year old son and a neighbor boy, Charles Smith, went along to drive the car. They left Stillwater around 11:00 P.M., and did not get back until about 4:00 A.M. of the next morning. These matters recounted are among undisputed points making up the background of the person charged.

The State furnished counsel for defendant at trial, and to prosecute his appeal to this court. Counsel vigorously represented the defendant throughout. The record was prepared at the expense of the State and filed here without cost.

For reversal some six propositions are advanced and argued in brief. After listening to oral argument, and a careful reading of the briefs and particularly the record, only the fifth proposition advanced has presented any difficulty and the record itself has resolved that. We shall treat the fifth specification of error last.

■ It is first said that the trial court committed error in refusing to exclude from the court room the county attorney, Robert M. Murphy, and the assistant county attorney, K. D. Greiner. Their names were endorsed on the indictment as witnesses for the State.

The record reveals that the case proceeded to trial, and the rule being asked for by defense counsel, all witnesses, except the county attorney and his assistant, who were conducting the prosecution, were excluded. The county attorney did not testify, but his assistant, K. D. Greiner testified, principally concerning a signed statement said to have been made by defendant. Counsel did not interpose an objection when Mr. Greiner was called as a witness, and no motion or pleading of any kind was filed prior to trial for purpose of disqualifying the named officials as witnesses. So far as the record reveals, the proposition we are considering was first raised in motion for new trial, and in motion for arrest of judgment. If the question was argued before the court, no record was preserved.

We have said that the exclusion of witnesses for the State at defendant's request, is not an absolute right in all cases, but rests in the sound discretion of the trial court, and this includes the power to except one or more witnesses from the operation of the rule. Dean v. State, 51 Okl.Cr. 138, 300 P. 319.

And we have further said that matters occurring during the trial of a case, which counsel desires to assign as error, must appear by proper recital in the case made, duly certified to as the law provides, independent of the motion for new trial. Fields v. State, 85 Okl.Cr. 439, 188 P.2d 231.

Here, as stated, the county attorney did not testify. Mr. Greiner aided in the prosecution. Ordinarily, the State should develop its evidence by others than the prosecuting officers, but we cannot say from the record before us that the court abused its discretion. Further, we have said that where no objection is made as to the qualifications of a prosecuting attorney, or his authority to appear until after the case is tried, in the absence of any prejudicial conduct such objection comes too late. Bethel v. State, 8 Okl.Cr. 61, 126 P. 698. This principle seems applicable here. The procedure for disqualifying a county attorney is outlined in Lattimore v. Verner, 142 Okl. 105, 288 P. 463. It was incumbent upon counsel to follow such procedure. It was not done. The next proposition should clarify the issue.

■ The next specification of error is the contention that the trial court erred in the admission into evidence over the objection of the defendant of a confession contended to have been involuntarily made by defendant while under the influence of drugs.

The evidence as pertains to this particular proposition developed that the alleged offense was committed by defendant at the home heretofore described, and lo-

cated at 1212 South Duncan, Stillwater, just across the street from a junior high school, and between 9:30 and 10:30 on the morning of November 10, 1955. Some time during the afternoon of that day the officers went to the Rhamy home and arrested both the defendant and his wife and took them to the county attorney's office. The county attorney, Mr. Murphy, was away at the time (though he came in before the questioning was completed), and his assistant, Mr. K. D. Greiner, questioned defendant as to the part he took in the commission of the alleged rape. By his personal use of a typewriter, Mr. Greiner typed out the questions and then the answers made by the defendant. A photostatic copy of the confession was received in evidence.

Mr. Greiner was called as a witness for the State to show the circumstances surrounding the taking of the statement. He said that the defendant freely and voluntarily made and signed the statement, after he had been advised that he did not have to make a statement, and that if he did so, it could be used against him as evidence.

After the alleged confession had been identified and offered in evidence, and after State's witness had testified to the circumstances surrounding the taking of the statement, counsel for defendant challenged same, as he said: "On the grounds that Mr. Rhamy was not in any condition himself and was not represented by counsel, and it was not a voluntary statement." The objection was overruled, and the confession was admitted into evidence. Thereupon counsel for the defendant proceeded to cross-examine the assistant county attorney, Greiner, in effort to develop that the confession was not voluntary. All this was in the presence of the jury. It was a matter for the determination of the court, but ordinarily the court should have excused the jury while he considered the matter. Counsel now cites the case of Williams v. State, 93 Okl.Cr. 260, 226 P. 2d 989, in which a rule of procedure is set out for the trial court to follow in such matters. This procedure is summarized in

paragraphs three and four of the syllabus, and may be referred to.

We cannot find from the record where counsel at the time did anything further than cross-examine the assistant county attorney. He did not ask the court to hear evidence in support of his argument advanced "that the defendant was sick, drugged and confused, and signed the statement and made the oral statement, if such were made and signed, more to rid himself of his tormentors than an admission of guilt." His evidence to support such assertion came along in the course of the trial. At no stage of the proceedings did counsel ever request the court to invoke the procedure outlined in Williams v. State, supra.

Defendant testified on trial as to his version of the facts surrounding the confession. He said in substance that his health was bad on account of having sustained an injury on April 25, 1935, while working at a refinery; that in December, 1954 he sustained another injury in falling off a truck, and hurting his back while hauling hay. He said that at the time of making the purported confession he was under the influence of drugs; that in a short space of time prior to making the statement he had taken several capsules containing narcotics, codeine, in the strength of one-half grain per capsule, prescribed by Dr. Thorpe. His testimony in substance was that he was under the influence of drugs to the extent that he did not remember making the statements in question. He stated, "I was too druggy to understand anything they said."

On cross-examination, he denied his signature appearing on the face of the written statement. As to the question of the effect of a person taking seven APC tablets containing a half grain of codeine each, defendant's witness, Dr. Thorpe, said that such might make some persons act in a drugged condition, which might last as long as four hours if they were allergic to the drug. He said he had not thought defendant allergic or he would not have prescribed the medicine.

Defendant had testified that he took seven of the capsules over a period between 4 A.M. and 7:30 A.M., November 10, 1955. Around 10 A.M. the postman delivered his welfare check in the amount of $132, and he went to town to cash the check and pay bills, and got back home before noon. He was not arrested until the late afternoon, he said. He claimed that he was in jail for three days before he discovered where he was, he was so groggy. Under the circumstances of the case, the question of whether the alleged statements made by the defendant were voluntary or involuntary was submitted to the jury, under proper instructions of the court. The issue by reason of the verdict was decided against the defendant.

This court has many times said that a defendant in a criminal case may waive any right not inalienable, given him by the constitution or by the statute, either by express agreement or conduct, or by such failure to insist upon it in seasonable time as will operate as an estoppel to his afterwards setting it up against the State. For varying analogous applications see: State v. Frisbee, 8 Okl.Cr. 406, 127 P. 1091; Ex parte Faulkenberry, 95 Okl.Cr. 259, 244 P. 2d 324; Sanders v. State, Okl.Cr., 287 P. 2d 458; Hughes v. State, 83 Okl.Cr. 16, 172 P.2d 439.

But above this, under the circumstances in the within case, we do not discover where defendant was prejudiced by the procedure now complained of, and find that the evidence in the case supports the receipt in evidence of the written confession questioned.

It is next urged that the testimony of the prosecuting witness was given under coercion. The basis for this claim is the fact that Rosie Bloom, the prosecutrix, lived with her grandmother, Mrs. Clyde Bloom, and she had adopted Rosie. Mrs. Bloom testified that about 3:30 P.M. November 10, 1955 she was called by the school authorities about Rosie, who had been absent from school, and she went to look for her, and found her coming from a bridge. Witness interrogated Rosie, and by reason of what Rosie told her she took her to the office of the county attorney of Payne County to have her repeat her story. We find nothing in the conduct of the mother to indicate that she coerced Rosie into dreaming up the accusations made.

It is next stated that the incident could not have happened at the time and in the manner testified to by Rosie Bloom. This is based principally on the evidence of the testimony of Mrs. C. A. Rhamy, sister-in-law of the defendant, who testified that she arrived at defendant's home on November 10, 1955 around 9 A.M., and that she saw the defendant, his wife and Rosie and that at that time they were all dressed and not in bed, though defendant did not have a shirt on. She did not stay over five minutes, and as she was leaving saw a young boy and a girl coming in. The boy was shown to be a neighbor boy. This conflicted with the evidence of Rosie, who said that the defendant raped her before Mrs. Rhamy arrived, she guessed the time being around 9:30 A.M. All the witnesses were apparently guessing as to the time the events they testified about happened. These were matters for the jury to consider.

■ The sixth proposition of error "that the verdict of the jury was the result of prejudice and passion aroused by the improper procedure and actions of the county attorney and assistant county attorney, and was not in accordance with the evidence of the case" will be considered along with the fifth proposition, where it is said: "That the testimony of the prosecutrix was highly improbable, was contradictory, was impeached and that her testimony was not properly corroborated." This presents the vital issue of the case, and requires a summary of the pertinent evidence, sordid though it is.

Counsel for defendant insists that in considering the facts developed that certain legal principles requiring corroboration of the evidence of a prosecutrix under enumerated circumstances, in a rape case,

should be kept in mind. Cited were the cases of Weston v. State, 77 Okl.Cr. 51, 138 P.2d 553; DeWitt v. State, 79 Okl.Cr. 136, 152 P.2d 284, and Self v. State, 62 Okl.Cr. 208, 70 P.2d 1083, which cases may be referred to. And we shall keep the principles in question in mind, such having a number of times in other cases been determinative of appeals presented. The facts herein shall be examined in light of the principles urged. See among cases where applied: Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160; Woolridge v. State, 97 Okl.Cr. 326, 263 P.2d 196; DeArmond v. State, Okl.Cr., 285 P.2d 236.

The prosecutrix, Rosie Bloom, testified that at the time of trial she was 14 years of age, and had been since January 1, 1956. She testified that she for a period of time ending in February, 1955 had been dated by Ted Rhamy, 17 year old son of the defendant. She had skipped school, which was located across the street from where defendant lived, on November 8, 9 and 10, 1955, to visit around the Rhamy home on those days. She said she did this to see Ted, although he was employed and left home early each day. She would go to her home for lunch, and then return about the time school noon recess would end. Mrs. Rhamy and the defendant were at home the three days in question. The afternoon of November 9 the Rhamys got a telegram to come to Enid to be with their daughter who was about to give birth to a child. They went to Enid, but got back to Stillwater the early morning of November 10, 1955, and witness arrived at the home after the defendant's children had left for school, but the Rhamys had gone back to bed. Defendant had on a sweat shirt and shorts, and his wife had on a brassiere and a night gown. From other evidence, the stove was out of commission, and the house was without warmth. Witness sat on the bed that contained defendant and his wife, and witness swore that Mrs. Rhamy asked her if she would have "relationships" with her husband, and witness answered "No". Soon Charles Smith, the neighbor boy, came in and defendant sent

him to get a joint of stove pipe to fix the stove. Said she:

"Well, pretty soon Charley Smith came back, and where he went, why, they didn't have any stove pipe there and Mr. Rhamy told him to go somewhere else and get it, and he gave him the money to get it with, and Mrs. Rhamy told him to hurry up and get out and I started to go with him and Mrs. Rhamy took hold of my arm and she told him to hurry up and get out of the way that they wanted to have intercourse."

On objection by defense counsel the court struck out from consideration of the jury the answer as to what Mrs. Rhamy said was to occur. There was no exception. After the Smith boy left, witness said:

"A. Well, she got to feeling around over my breasts and my privates, and she asked me to have intercourse with her husband, and I said no, that I had made a promise to her son, and she said that Ted wouldn't mind too much if I did it with his father, and I told her that I didn't want to, that I had still made a promise and wouldn't break it.

"Q. And then what happened? A. Her and him put me in the middle of the bed, and he went ahead."

Witness further said that Mrs. Rhamy put a finger in the privates of witness and fondled her before her husband got on her, and that after the act was completed, that: "Well, about that time Mrs. Rhamy asked him to do it with her, and he asked me to stay with her because she stayed with me, and he went ahead and did it with her, and I got up and then pretty soon Charley came back." She said Mrs. Rhamy prepared a douche and she went in the bathroom and took it. All parties got dressed, and when Charley Smith brought the pipe back they fixed the stove and witness walked down to an old bridge about five blocks away and played in the water a while, and then it was lunch time and she went home and had lunch; that her father drove her back to school but she came on to

defendant's home to see, so she said, Rhamy's son Ted. That she saw him, and he agreed to go with her to see her mother after school that evening. But she said that the school authorities had 'phoned her mother, who commenced looking for her and around 3:30 P.M. found her on the way back from the bridge; that she told her mother about the occurrence and that then her mother took her to see the county attorney, and late that evening the defendant was brought to the court house.

Clearly part of the story of prosecutrix is fantastic and unbelievable, particularly as to defendant at his age and physical condition performing with her and then immediately with his wife during the time Charley Smith had gone to get stove pipe.

But let us examine the defendant's testimony for corroborating circumstances. He admitted that Rosie Bloom stayed around his home November 8, 9 and 10, missing school. He also said that on November 9 she sat on his lap and drank some coffee, and she became amorous and kissed him on the lip, and then reached down and unzipped his pants and fondled his penis. He said that his wife was in the kitchen; that he told Rosie to quit, and told his wife about Rosie's conduct, and also told Rosie to go home, but that she would not.

As to the events on his bed the morning of November 10, he said that he had taken seven tablets containing one-half grain codeine, having been up all night on a trip to and from Enid, and that he was in a drugged condition and did not go to sleep until 7:30 A.M. That he remembered Rosie coming in his room the morning of November 10, that his wife was in bed next to him, that his wife said Rosie was in bed on the other side of her. He said, however, that his sister-in-law came in right at 9 o'clock and then Charley Smith came in with some stove pipe, and about 10 A.M. he fixed the stove, and the mail came and he got a relief check, and he then went to the store to get it cashed and pay some bills, and got back about noon and Rosie was in his bed asleep, and he woke her and said,

"You better get for home". He said that he had never invited Rosie into his home except one time when some boys were fighting her in front of his home and he invited her in to get away from the boys.

Dr. A. C. Redding made a vaginal examination of Rosie Bloom on the afternoon of March 10 at the request of the county attorney, and was subpoenaed as a witness but not used by the State. He testified on behalf of the defendant, and said that he made a smear in search of semen, but found none, but said that if Rosie had taken a douche that might explain that. He could not tell whether Rosie had recently had intercourse, because she did not have a hymen and there was no laceration or redness. He said the opening to the vagina was quite large, and indicated that she had had intercourse many times, probably over a period of one to two years.

The photostat copy of the written confession made by defendant that had been admitted into evidence reads:

"Stillwater, Oklahoma, November 10, 1955.

"By Mr. Greiner: You are advised that this statement must be made of your free will and accord without any force or violence being used on you— that no promises of leniency are being made and that you must tell only the truth.

"Statement by Theodore Rhamy.

"Rosie Bloom came to our house this morning about 9:00 o'clock and my wife and I were in bed in the front room of the house. I was sleeping in my underwear and my wife was sleeping beside of me. My wife had already fixed breakfast and sent the children to school and put the boy to work and had come back to bed.

"My doctor, Dr. Edward Thorpe, of Cushing, Oklahoma, had prescribed medicine to me for pain and rest. I had taken two pills at three o'clock A.M. and then had another one about seven thirty on Nov. 10 in the morning, after I drank some coffee.

"When Rosie Bloom got there she got on the bed of her own accord and said she was going to take off her skirt. I didn't see her and I don't know whether she did or not; anyway, she got back on the bed under the covers. After she got back in the bed she pulled her pants down and her underskirt was up, and I want to be frank with you, I got on her and that is the last I remember and I come to and it was limber and she (Rosie) was crying and she said, 'I want Ted. I want Ted.' and I did said, 'You got Ted.' She had her arms around me and I was holding her and she was crying. I have a son named Ted—he is 17—and they call me Ted too.

"By Mr. Greiner: Was your penis hard when you started to get on her?

"By Mr. Theodore Rhamy: Yes it was hard and that was the last thing I remember till I come to and it was limber and she had her arms around my neck and was calling 'Ted'.

"By Mr. Greiner: Did your wife give you permission to have sexual relations with Rosie Bloom?

"By Theodore Rhamy: She said, 'Do to suit myself.'

"By Mr. Greiner: Did your wife hold her while you had relations with her?

"By Mr. Rhamy: No, sir, she sure did not. She was willing to go ahead and she said she was old enough too.

"By Mr. Greiner: After you got off, what happened?

"By Rhamy: I got up and she walked in the kitchen and I went to working on the stove. My sister-in-law come and I got on my pants and Rosie run into the kitchen. There were no children there, they were in school. Rosie run into the kitchen before she opened the door for my sister-in-law. Charley Smith had been there once before my sister-in-law come. Charley Smith had seen her put her arms around me and kiss me that was about 15 till 4 this evening before she (Rosie) went home.

"By Rhamy: Yesterday and again this morning Rosie wanted to go to Enid with me and my wife and leave her at Enid. She said she was running off from home.

"I have read the above and it is all true, signed in the presence of my wife, Dale Flowers, deputy sheriff, and K. D. Greiner, and Robert M. Murphy.

"Signed: Theodore Rhamy."

We are compelled to hold that there was sufficient corroboration of the testimony of the prosecuting witness to support the verdict and judgment. Charles Smith was an important witness, and so was Ted Rhamy, Jr., but neither the State nor the defendant called either of them.

By reason of the evidence of Rosie Bloom's conduct, and the testimony of Dr. Redding indicating promiscuousness, if she had been two months older we would feel compelled to modify the sentence to five years, but under the statutory provisions we have cited, defendant was given the minimum sentence for rape in the first degree, and we are not authorized to modify the sentence. The Pardon and Parole Board is under no such inhibition where the prisoner brings himself within its regulations, and in its judgment the facts would justify relief.

By reason of the evidence the jury was justified in finding the defendant guilty of the crime charged, and was compelled to fix a penalty not less than that assessed. The verdict and the judgment appealed from must be, and are affirmed.

BRETT, P. J., and NIX, J., concur.