# EARNEST "SNOOKS" JOHNSON v. STATE.

No. A-10692.   June 25, 1947.

(182 P. 2d 777.)

Cecil Robertson, of Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The defendant, Earnest "Snooks" Johnson, a negro, was charged, tried, convicted, and sentenced to 35 years in the penitentiary for the crime of rape upon the person of Emma Helsey, a white girl, in Fort Gibson, Muskogee county, Oklahoma, on January 20, 1945.

The defendant is a negro, 23 years of age, who was charged in the Federal court in Muskogee in 1940 with the crime of burglary of the Fort Gibson Post Office, and to which charge he pleaded guilty and for which he was sent to the United States Reformatory at El Reno, Oklahoma. Thereafter, he saw service in the United States Army and from which service he was honorably discharged.

The victim of the alleged rape, Emma Helsey, is 19 years of age, the mother of a child conceived out of wedlock, which child was not born until June 13, 1945, after her marriage to John Stills on February 23, 1945. She testified she " didn't do nothing for a living while her mother took in washing."

John Stills, the man she later married, was her escort on the night of the alleged crime and sat idly by during the rape, making no effort to defend her, or to ascertain the identity of her assailant. Stills himself is an ex-convict.

The complainant, Emma Helsey, testified that she and John Stills, earlier in the evening and unaccompanied

by anyone else, went from Fort Gibson to Muskogee where they attended a picture show. Stills testified that they took another boy with them and let him out at Muskogee. Emma testified that they left Muskogee about 11:30 and arrived in Fort Gibson about 12:00 and that they came back alone, by themselves. Stills testified that after the show, they returned to Fort Gibson with another boy and let him out of the car in Fort Gibson at the Randolph Grocery Store. Both Emma and Stills testified that they went to the highway near the Frisco Depot and parked for about an hour; that it was cold and dark and had been raining. While they were thus parked, they said, about one o'oclock, Stills vomited. Just after he had finished throwing up, the man who assaulted her broke out the rear glass of the car with an iron rod. Her assailant ordered her out of the car, and said if she didn't do what she was directed to do, both she and Stills would be killed. Stills said there was nothing wrong with his car; that it was in good running order and filled with gas. But he made no effort to get it started and get away though the assailant was at the back end of the car. He did not move. She opened the door, got out and obeyed unhesitatingly and Stills sat idly by, not bothering to look either to the right or left. (Perhaps his condition would not permit him to notice what took place.) Emma further testified that the man never came around to where she was but stayed behind the car. She said she opened the door, got out, and went back to where he was. She said she got right up close to him, nearly against him. She then testified his cap was pulled down over his face—she tried to raise his cap brim but the man knocked her hand down and she said, "I think I know you." The man said, "Never mind who I am." She said her assailant did not have on glasses. She then testified her assailant took hold of her and took

her about five feet from the car, threw her down, took off her panties and had intercourse with her for twenty-five minutes. She said she offered no resistance and made no outcry, though there was a house only 175 feet from the place. Neither did the "spineless" Mr. Stills make any outcry. When she got back in the car, she said, her assailant was still at the scene on his hands and knees. Her future husband, John Stills, verified the time. He testified they were 75 feet away from the car. He said he heard no conversation but could hear them "snorting and blowing". He said that Emma cried when first ordered out of the car and that she cried after the ordeal. Nowhere in her testimony does she testify to or indicate a state of outraged sensibilities or disturbed state of emotions. The record discloses that she just took it.

As to the identity of the rapist, Emma testified he had on a striped engineer's cap and an army field jacket and a pair of blue overalls. She said she had known Snooks Johnson all her life and recognized his voice on the night of the rape. Stills attempted to identify him from his voice. She said she told Stills who had raped her and that it was Snooks Johnson. After the rape, both of them testified, they went to her home. Emma said her mother was awakened and unlocked the door and let them in. She was told of the rape by Emma and Emma said she thought she knew who had raped her but she didn't tell her mother that night who did it. The next day, she told her mother that it was Snooks Johnson. Stills didn't tell Emma's mother who it was, Emma testified. Emma said the next day, Sunday, about 10:30 a. m., she was in the kitchen looking out the window and she saw a negro man, whom she testified was Johnson, crossing the road in front of her house about 200 feet from her. She said he had on the engineer's cap, army field jacket and overalls.

She said his pants were muddy on the knees. Neither she nor her mother made a report of the incident to the officers until 5:30 p. m. Sunday when they came to her house after a report was made by Claude Garrett to the officers.

Stills testified that he reported the rape to Claude Garrett, the mayor of Fort Gibson, Sunday morning some time. He did not remember just exactly when. He says he didn't report it to any one else until Charlie Bruner and Constable Jarnigan came up to the house and asked him about it.

Claude Garrett, practicing attorney and mayor of Fort Gibson, testified that some time on or about January 21, 1945, in the morning, he saw Still's car across the tracks. He noticed the back glass was broken out. He had a chattel mortgage on the car and, of course, was interested in that. So, he stopped and asked Stills, "Who has been chewing on your back end?" And Stills said, "I got that knocked out last night down by the Frisco Depot." Garrett asked him "What happened?" and Stills reported in more or less a manner to find out what to do, that a girl had been raped the night before." He said Stills wanted to find out who he should report it to and "see if we can catch the fellow." He testified that he told Stills he would see Mr. Jarnigan or Charlie Bruner, another officer. He said that Stills didn't mention to him at that time whom he suspected of the crime. He didn't tell the mayor at any time whom he suspected and it was only after Snooks Johnson had been arrested that he became aware of the alleged assailant. Garrett testified that Stills did not go into details or volunteer any information as to whom he thought Emma's assailant was.

Charlie Bruner, deputy sheriff of Muskogee county, Oklahoma, testified that he knew all of the parties and that

he first got his information about the rape from Claude Garrett; that he went and talked to John Stills and Emma Helsey, and Emma told him that her assailant was Snooks Johnson. He said that he had seen Snooks Johnson wearing an engineer's cap, but he didn't know just exactly how long it had been but he imagined it was "six or seven months ago," or "something like that;" he "didn't know exactly." But, it was a blue and white striped cap, though he had not seen him wearing this cap recently. That he went to his house and searched for the cap, but did not find one. That he went to Snooks Johnson's brother's house and searched, but didn't find one; that he also searched for an army field jacket but didn't find one; that later on, he met Snooks Johnson's mother and told her that Snooks had sent him for his engineer's cap, but she said he had no such cap. He testified that it was about 3:00 or 4:00 o'clock in the afternoon when he arrested him and that when he took him into custody he had on a light pair of pants and that they could have been blue or faded out. He does not know what kind of shirt he had on, but he does know that he didn't have on a cap nor an army field jacket nor blue overalls. He said that Emma Helsey told him that the defendant had on an engineer's cap and a field jacket that morning. Right after he talked with her, he apprehended Snooks Johnson and placed him under arrest. He finally placed the time at which he saw Snooks Johnson wearing an engineer's cap along the latter part of last year, which would be the latter part of 1944. He then testified he did not know that Snooks Johnson was in the Army last year.

Oscar Winston, a negro, called to testify on behalf of the state, said he was 15 years of age and had known Snooks Johnson all of his life; that last year, he didn't remember when, he saw Snooks Johnson wearing an

engineer's cap when he worked at the feed company. He testified that he himself had a railroad engineer's cap which he had been wearing; that there were other colored boys around Fort Gibson wearing them. He testified that he saw the defendant on the night of the alleged rape in Clarence Green's beer joint and that Snooks Johnson stayed there that night and that he never saw him leave. He testified that he had never talked with the county attorney before. The night he stayed at Clarence Green's place was the Saturday night before the Sunday that Johnson was arrested. Snooks Johnson, Perry Ford, Wilbur Tarver and himself spent the night at Clarence Green's place, and they were playing cards; that Snooks Johnson was in and out of the game and once in a while would get up and leave, but that he played until he got broke and then he went to bed, about 2:30 or 3:00 o'clock in the morning. That when Johnson left the game, he would go and get some money, and get back into the game. When he got up the next morning, Earnest "Snooks" Johnson was there, and that he was there when he went to sleep. Winston also testified that he too was under parole, on a charge of grand larceny. With this witness, the state rested its case.

The defendant, Earnest "Snooks" Johnson, then took the witness stand and testified in his own defense that from about dark until 6:00 o'clock Sunday morning he was in Clarence Green's beer joint, upstairs, playing cards with Wilbur Tarver, Red and Perry Ford, and that he did not rape Emma Helsey. He said he did not leave at any time and go out to the Frisco tracks about a mile away, the place of the alleged crime. That on the night of the rape he was dressed in a sport shirt and two-tone cap, partly blue and white; that it was just an ordinary cap with flaps on it and was not an engineer's cap; that

he did not own either an engineer's cap or an army field jacket; that he did not have a suit of blue overalls. He asked the officers when they arrested him what it was for, and they said it was for investigation. That they never did tell him what he was charged with. He testified that after he was put in jail in Fort Gibson and later taken to Muskogee, at neither place did any one come to identify him. He said he always wears glasses; that he cannot see at night without glasses. Again he positively testified he never left the place at any time. He testified that he had never been by Emma Helsey's house, because he "didn't have any business to go by there." He testified further that he didn't go by her house on Sunday morning because he never left the business part of town, and that he didn't even go home Sunday. He offered in evidence his honorable discharge from the Army of the United States.

James Martin, a common laborer, testifying on behalf of the defendant, said that he saw the defendant upstairs over Clarence Green's beer joint a little after dark; that he stayed there until about 12:00 o'clock and that while he was there Snooks Johnson was in and out and that he thought he was still there when he left; that he knew Snooks Johnson was up there the night before he was arrested. He said that Perry Ford and Wilbur Tarver and himself played dominoes and pitch, and that Oscar Winston was there; that when he was playing, Snooks Johnson was mostly tending the fire; that he was in and out but didn't stay out long; that he didn't pay any attention about his clothes, but thought he had on a pair of blue pants and a white shirt and a blue hat.

Perry Ford testified on behalf of the defendant that he was a farmer; that he had known Snooks Johnson about 12 years and that on Saturday night before his ar-

rest on Sunday, he saw him upstairs in Clarence Green's building and that he got there about 9:00 o'clock that night and stayed until about 4:00 o'clock and during the time he was there he gambled a bit at first one thing and then another. He said that all the time he was there, he didn't see the defendant, Earnest "Snooks" Johnson, leave the building for any appreciable time, and that when he left the building at about 4:00 o'clock, Johnson was in the other room, in bed; that he went in there to go to bed himself but couldn't find a bed so he then went home. He testified that it was about a mile from Clarence Green's place to the Frisco Depot; that he didn't pay any particular attention to Johnson's coming and going; that they were playing cards and shooting dice on the night of the alleged rape and that Snooks Johnson shot dice.

Leonora Gandy, testifying in behalf of the defendant, said, on the night in question she was staying upstairs at Clarence Green's place; that was the night of January 20th and she saw Snooks Johnson up there about 10:00 o'clock and she again saw him about 11:30; she saw him the next morning about 9:30 and at that time he had on a brown pair of pants and a white striped shirt and that the night before he had on the same clothes; that she is a sister-in-law of Snooks Johnson. She testified that Snooks Johnson did not have any clothes at Clarence Green's place besides the clothes he was wearing; that she never saw him wearing an engineer's cap or a cap of any kind.

Lena Johnson, testifying in behalf of the defendant, said she was the mother of Snooks Johnson and that she remembered when Snooks was arrested. She said that shortly after Snooks' arrest she saw Charlie Bruner and he said that "Snooks wanted me to send him his cap like

the 'brakies' wear" and she told him that he didn't have such a cap. She further testified that he didn't have an army field jacket; that the only clothes he had were the ones that he kept at home; that he didn't have but two pair of pants and his soldier's clothes. She further testified that he had a two-toned cap. She saw him the night before he was arrested, in the early part of the evening, at Clarence Green's place as she passed by.

Wilbur Tarver testified that he knew Snooks Johnson and that the night before he was arrested he saw Johnson upstairs over Green's building at about 11:00 o'clock and that he stayed there that night until about 3:00 or 4:00 o'clock and that Johnson went into the next room and he and Oscar Winston lay down. He didn't recall how Johnson was dressed that night. He said that they were playing Casino; that Snooks was there after 11:00 o'clock; that he may have been in and out a half dozen times.

In Workman v. State, 62 Okla. Cr. 81, 70 P. 2d 133, 135, this court said:

"A charge of rape is one that arouses the passion and prejudice of the jurors, and for that reason it is the duty of the court to clearly scrutinize the evidence and where the evidence of the state is unreasonable, inconsistent and contradictory, or indications are that the prosecution is maliciously inspired, the court should not permit a conviction to stand. A charge of rape is an accusation easy to be made, hard to prove, and harder to be defended by the accused, though ever so innocent. This court is not unmindful of the rule frequently announced by it that the weight of the evidence and credibility of the witness is for the jury, and the court will not reverse a conviction on conflicting evidence where there is substantial evidence supporting it. Witt v. State, 29 Okla. Cr. 357, 233 P. 788; Walker v. State, 20 Okla. Cr. 319, 202 P. 799; Sher-

man v. State, 20 Okla. Cr. 306, 202 P. 521; Ravenscraft v. State, 23 Okla. Cr. 361, 214 P. 946."

The foregoing statement is sound. The first line thereof is especially applicable in a case where the accused is a negro and the victim is a white woman. In such cases, the mere accusation is almost sufficient to result in a conviction. In all rape cases it is especially the duty of the court to clearly scrutinize the evidence, standing between the accused and the passion and prejudice of the jurors. It is the duty of the court to apply the same rules of justice, the same rules of careful consideration and fair play to all alike, whether the accused be white or black.

In Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083, 1091, this court said:

"While a conviction for statutory rape may be had on the uncorroborated testimony of the prosecutrix, this is only warranted when all the other facts and circumstances of the offense are corroborative of her testimony and her statements are not inconsistent or contradictory. Without such surrounding facts and circumstances, the bald statement of the prosecutrix against the defendant would be so devoid of testimonial value as to render it unworthy of belief."

This rule applies with like force to a case of first degree rape. In the last case cited, the court quoted from Morris v. State, 9 Okla. Cr. 241, 131 P. 731 as follows:

"This court does not hold with some that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing. And, where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the com-

mission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

With these principles in mind, let us look at the case at bar. The evidence to support the charge of rape is highly conflicting, contradictory, and unsatisfactory, if not improbable. Emma Helsey and John Stills are in hopeless conflict about the fact of another boy going to and coming back with them from Muskogee. They are not in agreement about Still's being sick. She mentions it but he does not. They are not in agreemnt about her crying, either before or after the rape. Her mother offered no evidence as to her daughter's outraged 'sensibilities or disturbed state of emotions. He says she cried but she never alluded to it. Though the automobile was in good running order and filled with gas, Stills says he made no effort to escape with Emma before the rape. She says that the rape occurred five feet from the car. He says the rape occurred 75 feet from the car. She testified she said to her assailant, "I think I know you" and her assailant said,, 'Never mind who I am." Stills said there was no conversation between Emma and her assailant. Emma testified she offered no resistance to her assailant nor made any outcry and had intercourse with him for 25 minutes. Stills said where the rape occurred the ground was "all plowed up", indicative of resistance. Stills said he sat there for

25 minutes and never looked back to see what was going on. And, though there was a house 175 feet near by, he made no outcry. Although it was only a mile to town, he never slipped out of the car to go for help. He could easily have obtained assistance and apprehended the assailant in the act if he had been half as interested in her as he was in his own safety. Emma says her assailant was on his hands and knees when she got back into the car. She testified she told Stills who raped her. When she got home, neither she nor Stills told her mother who raped her though they did say that she was raped. The next day, Stills talked with the mayor about the rape but never indicated to the mayor who raped her. Stills never reported it to the officers to whom the mayor directed him. The mayor told the officers and they then came and inquired of Emma and Stills about the rape. On Sunday, following the rape and shortly before Johnson was arrested, Emma testified she was standing in the kitchen looking out the window and saw her assailant wearing the engineer's cap, the army field jacket and the blue overalls that he wore the night before, when he raped her. She said he had mud on his knees; he was about 200 feet away. The record shows that the defendant had no such cap, no such field jacket and no blue overalls. It discloses that there were no other negroes in Fort Gibson who had such caps. When he was arrested a short while later, the record shows he was arrested in the business part of town and that he did not have on an engineer's cap, blue overalls with mud on the knees, nor an army field jacket. In this connection, the record shows that Johnson testified that he had not been out of the business section since the evening before. The officers made a search of Johnson's residence and his brother's place for the cap, the jacket and the overalls but could find neither. It shows they at-

tempted to trick Johnson's mother into producing the cap and that she promptly said he had no such cap. As to the defendant's being clad in blue overalls, having mud on its knees, it occurs to us that the back of the victim's dress would have been muddy and discolored if she had intercourse for 25 minutes and was on the bottom and the ground was all plowed up as John Stills would have us believe it was. What became of the dress? Why wasn't it introduced in evidence to corroborate her story? No medical examination was sought or made to determine the fact of entry. Moreover, even after the defendant's arrest and imprisonment, at no time thereafter up to the day of the trial was the defendant ever confronted by Emma Helsey or John Stills for the purpose of obtaining positive identification. On the contrary, the prosecutor elected to wait. What better time could have been selected for this purpose than that immediately following the arrest of Johnson, when the picture was fresh in Emma Helsey's mind? We must take judicial notice of the fact that the longer the delay, the less positive is the identification and the more speculative is the proof; the more likely the picture will become a dim and unreasonable piece of guesswork. In its final analysis, there is little upon which to base the identification on this cold, dark, rainy night except the voice of Emma Helsey's assailant. To sustain this record, we believe, would compel us to resort to the razor's edge in identification. We would be required to slice the doctrine of reasonable doubt to a thinness not warranted under the law. This conclusion is supported by the record made in behalf of the defendant.

It reveals the defendant positively denies his guilt and offers a substantial alibi. In this, he is subtantially corroborated, even by one of the state's witnesses whom,

in an effort to bolster the state's case, the prosecutor put on the stand without having ever talked to the witness.

Suffice it to say, the record as a basis for conviction is most unreliable and speculative. If Emma Helsey was raped, as she testified she was, it could just as easily have been any one of the other negro boys in Fort Gibson who owned an engineer's cap, an army field jacket, and blue overalls. It might just as easily have been the unidentified person who came from Muskogee with them to Fort Gibson on the night the rape is supposed to have occurred. The correctness of the identity in this case is highly speculative. This court will not follow the whims of speculative justice nor accede to the possibilities of passion and prejudice when the record of the state is composed of such conflicting, contradictory, and unreliable evidence as herein presented, particularly as to the matter of identification. To paraphrase an old Southern expression, "there may be a negro in the woodpile", but we cannot say, under the record herein presented, beyond a reasonable doubt, that Earnest "Snooks" Johnson (the negro in this case) is the guilty man.

In McLaurin v. State, 34 Okla. Cr. 324, 246 P. 669, 671, this court said:

"It is true that this court has held many times that there is no rule of law which forbids a jury to convict for the crime of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony. It does not follow, however, that a conviction upon such testimony is to be arbitrarily sustained under all circumstances. In some states, corroborating evidence is required by the statute.

"It is true that convictions for rape must rest largely upon the testimony of the prosecutrix, and direct cor-

roborating testimony is well nigh impossible to procure. However, where the charge is true, there will almost always be some corroborating evidence, such as injury to the person or clothing of the prosecutrix * * *." See, also, Workman v. State, supra.

Here, there is no showing of either injury to her person, or damage to her clothing.

In Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838, 845, this court said:

"The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty."

One other assignment of error is the court's refusal to give a requested instruction setting forth the theory of the defense.

In this connection we have carefully examined the court's instructions covering the case, and are of the opinion that this contention is meritorious. Nowhere in the court's instructions does he present to the jury the defendant's theory of the lack of corroboration of the prosecutrix' testimony, the defendant's specific denial, his alibi, corroboration thereof, and the necessity of establishing in the minds of the jurors the identity of the defendant beyond a reasonable doubt. The jury was entitled to be advised in the court's instructions as to the theory of the defense. It was error for the court not to do so. It is altogether possible that if the court had instructed the jury on the theory of the defense, it might have returned a different verdict. It is apparent that there was some doubt in their minds as to the sufficiency of the evidence

to warrant them in arriving at a penalty. Hence, they passed the matter of sentence and punishment to the court. Had they been convinced of the sufficiency of the evidence to support their verdict, we believe that they would have exercised their right to fix punishment, and we have little doubt as to what that punishment would have been. The testimony of the prosecutrix as to the actual commission of the crime and the identity of her assailant is not corroborated. Her testimony as to the commission of the crime and as to the identity were both contradicted. Moreover, the defendant positively denied the charge and presented a substantial alibi as to his whereabouts at the time of the alleged offense. Under the rule announced in Douglas v. State, 19 Okla. Cr. 257, 199 P. 927, and Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617, 618, this court said:

"Under the laws of this state a conviction for rape may be had upon the uncorroborated evidence of the prosecutrix, however, where the testimony of the prosecutrix is contradictory, and her reputation for truth and veracity is impeached, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction."

In Finley v. State, 84 Okla. Cr. 309, 181 P. 2d 849, 861, this court said:

"A party is entitled to have the jury instructed on the law governing the issues according to his theory, providing such theory is tenable as a matter of law, or finds possible support in the evidence * * *."

The defendant makes other assignments of error of some merit, but which are not necessary for us to consider, in the light of what we have already said.

After carefully considering all of the evidence and circumstances surrounding the case, the insubstantial nature of the identification, and the failure of the court to properly instruct the jury, we are of the opinion that the record is insufficient to support the conviction. It may be possible that the prosecutor now has additional evidence which will support the charge, and for that reason he may desire to try the defendant again. If so, he has the permission of this court so to do.

This cause is therefore reversed and remanded for further proceedings not inconsistent herewith.

BAREFOOT, P. J., and JONES, J., concur.