## LOUIS v. STATE.

No. A-11217.   Sept. 6, 1950.

(222 P. 2d 160.)

Tom Finney, I. C. Sprague, Idabel, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. Plaintiff in error, Silas Louis, hereinafter referred to as defendant, was charged by information filed in the district court of McCurtain county, with the offense of first degree rape. Pertinent allegations read:

"That is to say the said Silas Louis, in the County of McCurtain, State of Oklahoma, and on or about the 12th day of June [1947] then and there being, did then and there unlawfully, willfully and feloniously rape, carnally know and have sexual intercourse with Cleta Webb, a female person under the age of fourteen years, * * *."

Defendant was tried before a jury, and the judgment and sentence of the court, entered October 12, 1949, was that he serve a term of 50 years' imprisonment in the State Penitentiary. An appeal has been perfected to this court. Some 17 specifications of error are set out in the petition in error, but the case is argued under five propositions.

We shall first consider defendant's Proposition Two:

"That the trial court should have required the state to elect which of the acts in evidence it charged the defendant with, or have treated the first act on which the evidence was offered as an election and instructed the jury accordingly."

It will be noted that the information charged that the rape took place on June 12, 1947, whereas the witness Cleta Webb testified after many leading questions by the county attorney, all of which questions was objected to by defendant's counsel, that some time about the middle of June, 1947, her mother went to Oklahoma City to see a doctor and that after she left her stepfather took her into the bedroom and placed her on the bed and got on top of her and placed his private parts

in hers; that she was 11 years of age at the time and had never before had intercourse with any one, but that it did not hurt much; that her brothers Robert, age 9, and Dalton, older than witness, had gone to the field to work; that on the night of this day she and Robert slept in the room with her stepfather, the defendant, and that Dalton slept in the adjoining room; and that defendant "did the same thing that night", and that the next morning "he did the same thing" and again that night "did the same thing", and then her mother came home, but about one week later in the woods "he did the same thing", thus making five separate acts.

Counsel for defendant did not interpose a motion to require the state to elect upon which of the several acts it intended to rely for a conviction. The trial court did not require such an election or consider this matter in the instructions given, but instructed the jury:

"No. 1. The exact time the offense is alleged to have been committed is immaterial. Proof of the commission of the offense at any time prior to the 13th day of October, 1947, the date of the filing of the original complaint herein, and subsequent to the 16 day of November, 1907, the date of statehood, will be sufficient as to time."

In the absence of request by counsel for defendant, the court should have treated the act claimed to have taken place on the morning the defendant's wife left the home for Oklahoma City as an election, and by proper instruction have limited the jury to a consideration of such particular act as a basis for conviction, and have limited the consideration of the other acts as corroborative and as showing the relation of the parties.

In the case of Kilpatrick v. State, 71 Okla. Cr. 129, 109 P. 2d 516, 517, this court had this question for consideration, and there stated:

"In a trial upon a charge of rape, proof of other acts of intercourse may be shown for the purpose of corroboration and as showing the relation between the parties; but a conviction must be based on one act. Where, as in this case, the defendant is not tried with reference to one particular act, but two separate and distinct acts, reversible error is committed when the prosecution is not required to elect one specific act, and the trial court fails to treat the first act proven as an election."

In Cooper v. State, 31 Okla. Cr. 217, 238 P. 503, 504, we said:

"It is well settled that in a prosecution for statutory rape, where there is evidence of more than one act of sexual intercourse between the defendant and prosecutrix upon which a conviction could be had, it is the duty of the trial court, upon motion, to require the state to elect upon which of the several acts it intends to rely for a conviction. If no motion is made to require the state to elect, the trial court of its own motion, should require the prosecution to elect upon which of said acts it will rely, or should treat the act of which the state first introduced evidence which tends in any degree to prove the offense as an election, and should by proper instruction limit the jury to a consideration * * * of other acts as corroboration and as showing the relation of the parties."

And see the late case of Cambron v. State, 86 Okla. Cr. 437, 193 P. 2d 888, as well as the cases cited in the above opinion.

Counsel further contends:

"That the evidence adduced at the trial was insufficient to sustain a conviction of rape."

This necessitates a consideration of the facts and circumstances surrounding this case, as disclosed by the evidence.

Oral argument was had in this case on April 19, 1950, and the Attorney General practically admitted the strength of the position of counsel for defendant, and has not filed a brief in answer. This is practically a confession of error. We find from the record that the defendant is a full-blood Choctaw Indian; that he has been a resident of McCurtain county all his life, except a period during the war when he worked in a war plant in Oklahoma City; that on the 8th day of July, 1941, he married a widow, Susie Webb, who at the time of marriage had five children; that defendant took his new family to live on his allotment north of Hochatown.

To prove its case the state used four witnesses: Cleta Webb, stepdaughter and alleged victim, Dalton Webb, stepson, and two physicians. The evidence discloses that the conviction was had on the uncorroborated testimony of the defendant's stepdaughter, Cleta Webb. At the trial she testified that she was then 12 years of age (October, 1948); that in June, 1947, she and her two brothers Robert and Dalton (at the time of trial, aged 9 and 15 years respectively), lived with their mother, Susie Louis, and their stepfather, Silas Louis, at Hochatown, in McCurtain County; that about the middle of June her mother went to Oklahoma City; that the morning her mother left her said two brothers went to the field to work; that after they left her stepfather took her into the bedroom and placed her on the bed, got on top of her and placed his privates in hers, as heretofore recited. She testified to three more acts prior to her mother returning after being gone two nights, and to a fifth act a week after the mother returned. She testified that prior to these acts that she had never had intercourse with anyone. She stated that she was in the habit of sleeping with the younger brother while Dalton, the 15 year old,

slept in the same room in bed with a hired hand. Her mother and father slept in an adjoining room. She had an older brother, Doc, who no longer lived at home, but was married and lived at Broken Bow. She testified that she did not tell anyone about these occurrences until in October, 1947, and at that time did not tell her mother, but told her elder brother, Doc. It appears from the record that her mother and stepfather had been fussing and Doc had driven to Hochatown and had driven the mother and children to Broken Bow, and the father came to Broken Bow that night, stayed all night with them at Doc's and urged his wife to return home with him, which she agreed to do, and then Cleta gave Doc her story and he had the charges filed, and the mother did not learn of the charges until the next day when the officers came to arrest her husband.

Cleta testified that prior to the acts recited that her stepfather had never offered to molest her, and had not since the time in the woods. She admitted that she had never mentioned any of the acts in question until she talked with Doc, her elder brother, and waited over 4 months to do that. She stated that her stepfather did not caution her not to tell. After many leading questions by the county attorney, she stated:

"He didn't exactly ask me not to tell her [the mother]. He asked me not to before, not to tell." She was asked by the county attorney: "Do you know why you didn't tell your Mother? A. No, sir, I don't."

On cross-examination Cleta could not say how many brothers she had, did not know definitely whether her brother Doc was the eldest or not, was not certain about a number of other matters concerning herself and her family that ordinarily a girl of that age could have readily answered. She testified that after her stepfather got

out of jail [having been released under bond] that he took her mother, her younger brother and herself to Durant to live; that she was attending school and that her stepfather had been good to her. She testified that she had never told her mother that the acts of which she had accused her stepfather never took place, but stated that she told the special prosecutor, Mr. Coker, and her brother Doc after the preliminary, that what she told about her stepfather never happened, but that "he got me scared" and she was asked: "Q. Did they tell you if you did not come up and tell it, that they would put you in jail and put your mother in jail? A. No, sir, they didn't tell me they would put me in jail but mother might have to go." She repeated several times that she attempted to tell the prosecutors that the acts did not happen, but testified that they got her brother Doc to talk to her all the morning of the trial and he insisted that she testify. She insisted that she was scared. On redirect examination by Mr. Coker, she testified that he only told her to tell the truth and that no one threatened her, but she insisted that she understood something would happen to her mother.

Dalton Webb testified that the two nights his mother was away his sister Cleta slept in the room with his stepfather, Cleta sleeping with the defendant and Robert in the other bed, and that he never thought anything about it and that Cleta never mentioned to him about anything happening to her.

Drs. J. T. and W. A. Moreland testified that they examined Cleta's privates after the charge was filed against her stepfather, that they did not find a hymen present and that her vagina was as large as most married women, and in their opinion she had been "stretched in some way by somebody or something."

The foregoing is the gist of the State's evidence on which it relied for conviction, and the details of the acts were elicited by leading questions.

The defendant testified in his own behalf and denied ever having at any time or in any way molested Cleta, and specifically denied the acts charged, and testified that the first he knew of the charge was after the officers took him before the county attorney; that he was arrested without warrant and the officers told him he would find out later what the charge was. He testified that just prior to his arrest he and his wife had a little fuss and that while he was playing in a ball game at Hochatown that Doc got his wife and children and took them to Broken Bow without his knowledge and that he went after them and persuaded his wife to return home with him the next morning; that he was going to hire a taxi for the trip, but finally his wife persuaded Doc to take them back, but he acted funny and took a 30-30 rifle with him. On getting home they milked a cow and gave Doc some of the milk; that Doc left and soon thereafter the officers came and arrested the defendant.

The defendant further testified that after he got out of jail on bond his wife came and told him that she wanted to go back to him as Cleta told her the things she testified to did not happen, and that since then he and his family had been living in Durant; that Cleta told her mother in his presence during the trial that she had told her brother Doc and the prosecutors the things she had told him did not happen, but that they got her scared, and she told her mother that she was afraid they might send the mother to the penitentiary if she did not testify.

Defendant further testified that he lived in a two-room apartment when working in Oklahoma City, and his

place was blown away in a storm, his wife losing one leg, and he had to send his children to Doc's. He claimed they were running around while at Doc's, and went to Hochatown to stay when he thought they were at Doc's. The court sustained an objection of the county attorney to the statement that they were running around. However, the fact that the children were not with their parents and going from one place to the other afforded plenty of opportunity for things to happen to Cleta, and further demonstrates that there must have been not the best of feeling between Doc and the defendant.

Mrs. Susie Louis testified to her marriage, the family, about being away in Oklahoma City two days in June, 1947; that Cleta never mentioned to her that her stepfather had mistreated her; that the first that she knew of such a claim was after Silas had been arrested, following a fuss she and Silas had; that since the arrest her daughter had told her that the statements she had made were not true; that on the morning of the trial the special prosecutor had talked to Cleta all the morning and had Cleta scared.

Charley Walker testified that he had lived in McCurtain county 54 years and had known Silas Louis 25 years and knew the reputation of Silas Louis in his community for being a moral and upright man, and that it was good. Charley McGowan testified that he had known Silas Louis since 1918, and he also testified to his good character. Sterling Jacobs testified to having known defendant all his life and he also testified to his good character.

The defendant demurred to the state's testimony and also requested an instruction advising the jury to return a verdict of not guilty for the reason that the tes-

timony was not sufficient to sustain a conviction for the offense of rape.

This court, in the early case of Morris v. State, 9 Okla. Cr. 241, 131 P. 731, 735, speaking through Doyle, Judge, said:

"This court does not hold with some that, as a matter of law, rape cannot be established by uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing. And, where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction of her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

This case has been adhered to in a long line of cases, including Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Witt v. State, 29 Okla. Cr. 357, 233 P. 788; Cambron v. State, 86 Okla. Cr. 437, 193 P. 2d 888; Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; DeWitt v. State, 79 Okla. Cr. 136, 152 P. 2d 284, 289.

The DeWitt and Cambron cases quote from Maxwell v. State, 78 Okla. Cr. 328, 148 P. 2d 214, 217, where we said:

"From an early date this court has adopted the rule that one may be convicted upon the uncorroborated testimony of the prosecutrix. [Citing cases] But we have limited this rule with an exception which is as well established as the rule itself. It is that the testimony of the prosecutrix in a rape case must be clear and convincing, and where it bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it will be held as insufficient, and under these circumstances must be corroborated to the extent of making it sufficient [citing cases].

"This rule has more often been applied in cases where the prosecutrix is a child of tender years and more susceptible of coming under the influence of others, or through fears, threats, coercion or duress. [Citing cases.]"

The testimony of the prosecutrix that sexual relations took place between her and her stepfather when she was only 11, and that she had never had sexual relations with anyone before and that it did not hurt much, and then that she and her stepfather joined her two brothers in the field immediately thereafter without their suspecting anything; and then her testimony to three more acts, one that night, one the next morning and one the following night, two of which are supposed to have happened while her younger brother was in the same room and the older in an adjoining room, and they did not detect anything, is incredible.

The rupture of the hymen could be expected to produce blood and pain and cause a young child to become nervous and upset, and tell-tale evidence on bedding, clothing, washbasin, etc., that would attract the attention of the two boys sleeping so close, and with access to all places they had access to. Then it is not natural that the child would wait four months to tell anyone, and then not tell her mother, but an older brother. A greater amount of timidity could be expected between a broth-

er and sister than between a mother and daughter. And it is of significance that the story was not given out until the time when the mother was returning to live with the stepfather after a little fuss, and apparently not with the approval of her son Doc. The son (as well as the daughter) failed to take the mother in his confidence. The evidence further shows that the eldest son was with the prosecutor all the morning of the trial and spent his time endeavoring to get his sister to testify as in the preliminary, though she had told them that what she had testified to was not true. She testified that she was afraid. This court in Self v. State, supra, held:

"A conviction for statutory rape will not be sustained where testimony of prosecutrix is obtained through fear, coercion, or duress, and is not corroborated by other competent evidence."

The prosecutrix was a very unsatisfactory witness and the county attorney persisted in leading her. She denied and refuted the charges to her mother; but swore that she refuted them only to her brother and the special prosecutor. Her mother, on the other hand, swore that she refuted them to her after the defendant got out of jail and on the morning of the trial told her, in the presence of the defendant, about advising her brother and the special prosecutor that the things did not happen.

In Self v. State, supra, we held:

"In prosecution for statutory rape, credibility of prosecutrix may be impeached by proof that she made statements relative to issues contrary to her testimony."

Also in the same case, we held:

"In prosecution for statutory rape, opportunity may be considered as one of circumstances, but it is not corroboration and cannot be considered on subject of corroboration."

"Proof of absence of hymen eight months after alleged statutory rape held not to constitute corroboration of prosecutrix."

We do not find it necessary to consider the other three propositions advanced by defendant. Proposition Two, first considered, is sufficient for reversal of this case, but above that it is our opinion that no person should be convicted of crime on such improbable, discredited, and unreasonable evidence as that given by the prosecutrix in this case, adduced by leading questions and by the prosecutrix attempted to be retracted.

The judgment of the district court of McCurtain county is therefore reversed, and the defendant discharged.

JONES, P. J., and BRETT, J., concur.