**DAVIS v. STATE.**

No. A–12001.

Criminal Court of Appeals of Oklahoma.

July 7, 1954.

Richard A Hays, Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., Edgar R. Boatman, County Atty., Okmulgee County, Okmulgee, for defendant in error.

POWELL, Presiding Judge.

The plaintiff in error, Lewis Davis, hereinafter referred to as defendant, was tried before a jury and convicted for the crime of molesting a child under the age of 14 years, and punishment was assessed at confinement in the State Penitentiary for a term of three years.

The charging part of the information reads:

"That the said Lewis Davis did unlawfully, wilfully, feloniously, intentionally, knowingly, lewdly and designedly look upon, touch, maul, and feel of the body and private parts of a female child, to-wit: Patsy Sue Shaffer, of the age of eleven (11) years, a female child under the age of 14 years, at one half block north of Jack Dale's Service Station, which is located on U. S. Highways 75 and 266, approximately one-half mile east of the city limits of Henryetta, Oklahoma, in a knowing, intended, lewd, unlawful, wilful, designed, felonious, lascivious, and indecent manner, with the unlawful, wilful, intentional, lewd, lascivious, indecent and felonious intent and purpose on the part of him, the said Lewis Davis, then and there on the part of him, the said Lewis Davis, to commit the crime of lewdly and lasciviously looking upon, touching, mauling and feeling of the body and private parts of Patsy Sue Shaffer, a female child under the age of 14 years, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

The statutory provision covering the crime charged is Tit. 21 O.S.1951 § 1123, which reads:

"Any adult person who shall knowingly and intentionally make any oral or written lewd or indecent proposal to any child under the age of fourteen (14) years for such child to have unlawful sexual relations, or sexual intercourse with him, or her, or any other person; or any such adult person who shall intentionally and designedly look upon, touch, maul or feel of the body or private parts of any child under the age of fourteen (14) years in any lewd, or lascivious manner by any acts not amounting to the commission of any crime against public decency and morality, as may now be defined by the laws of Oklahoma; or any such adult

person who shall designedly ask, invite, entice or persuade any child under the age of fourteen (14) years to go alone with him or her, or any other persons, to any secluded, remote or secret place, with the unlawful and wilful intent and purpose then and there, to commit any crime against public decency and morality, as may now be defined by the laws of Oklahoma, with such child or to in any manner lewdly or lasciviously look upon, touch, maul or feel the private person or the private parts of such child in any indecent manner, or in any manner relating to the sex matters or sex interest, shall be deemed guilty of a felony and upon conviction thereof, he shall be punished by inprisonment in the Oklahoma State Penitentiary for a term of not less than one (1) nor more than five (5) years."

Complaint is made that the verdict is not sustained by sufficient evidence, of improper conduct of the county attorney in the cross-examination of the defendant, and of prejudicial argument in his closing address to the jury; and that the penalty assessed is excessive and given under the influence of passion and prejudice.

Considering the evidence: Patsy Sue Shaffer testified for the State that on May 20, 1952 she lived at Spelter City, with post office address Route 2, Box 68C, Henryetta, and at the time was eleven years old; that she had lived with her parents in Spelter City all her life, and was in the sixth grade at school, and had gotten out of school that day about 4 o'clock.

That at about 4:15 P. M. she and Tommy Stephens, a small boy, and Sharon Vaughn, age ten years, went a short distance from Sharon's home to a small creek or brook where there was a box-like concrete culvert about four feet in depth and width, to fish for "crawdads". The fishing hole was along an old roadway; that about five minutes after they started fishing she noticed a strange man walking along the road going in a southeasterly direction; that about 15 or 20 minutes later this same man returned along the road carrying sack of groceries. She stated that he did not stop or speak to

her when he walked along the road the first time.

Witness further stated that to get to where she was fishing one had to go down an embankment about four feet and then it slanted down about one foot, and that there were weeds and bushes. That she was sitting on a part of the concrete embankment with her feet hanging off, fishing in water near the culvert part.

Witness stated that when the man whom she identified as the defendant returned along the road with a sack of groceries he stopped. She testified as follows:

"A. He said something, then. He said 'Fishing?' I said 'Yes'. And he said, 'let me see you throw your hook in.'

"Mr. Hays: If the Court please, we can't hear her.

"A. 'Let me see you throw your hook in, and catch something.'

"Q. Did he come down by where you were? A. He said, 'Who is that on the other side fishing?' And I told him. He asked me who it was, and asked me if they had caught anything. And I said, 'No'. And I asked him why he didn't go over there, on the other side, and see them.

"Q. Was he talking to you from off the road, at that time? A. Yes, sir.

"Q. Did he ever come down, and sit down beside you?

"Mr. Hays: If the Court please, we object to the question, leading, suggestive question.

"The Court: Overruled.

"Mr. Hays: Exception.

"Mr. Richeson: Did he ever come down? A. Yes, sir.

"Q. From the road to you? A. Yes, sir. He came down and talked to me.

"Q. He came down where? A. He came down beside me. He came down, but up on the bank.

"Q. How far away from you was he? A. About a yard. Or not that much.

"Q. Did you get your line untangled? A. Yes, sir.

"Q. By yourself? A. No. He said, 'Here, let me see if I can get it untangled for you'. After he had already jumped down.

"Q. Did he assist you in untangling the line? A. He tried to but he never finished it.

"Q. Did you get a good look at him? A. Yes, sir.

"Q. Would you know him again, if you saw him? A. Yes, sir.

"Mr. Richeson: Is he in this court room? A. Yes, sir.

"Q. Would you point him out to me, please? A. He is right behind that man with the blue suit.

"Q. Did you notice anything about this man, that would cause you to remember him? A. Yes, sir.

"Q. What? A. He had a finger off, on his right hand.

"Q. On the right hand. I would like you to tell the jury, Patsy Sue, just what happened from the time that this man squatted down there beside you. A. After he squatted down beside me, Sharon and Tommy came back from the other side. And they said they were going on the other side of the road to fish awhile. When they said that, he sort of grinned. They went on over there. Fished for a little bit. And then he reached over and pinched me on the breast.

"Q. He pinched you where? A. Breast.

"Q. Which breast? A. Right hand side.

"Q. Where was he sitting in relation to you? A. Right beside me.

"Q. On which side? A. The right.

"Mr. Richeson: On the right. All right. Now did he say anything else to you? A. Yes, sir. He said, 'You have got a sure big one, haven't you?'

"Q. And what was your answer? A. I said, 'Yes'.

"Q. Did he say anything else to you? A. Not for a little bit. And then he caught me by the knee, and asked me to let him put his hand up my dress, and feel of it. I told him 'No'. And then he offered me fifty cents to put his hand up, to go up to the store and buy myself something. I told him I didn't want fifty cents. I didn't want to buy anything.

"Q. And then what happened? A. And then he tried to, again, and then I started screaming, and jumped back. And then when I got up, he jumped up. He picked up his groceries. At the same time Sharon and Tommy were coming back on across the road. They saw him. He went north, and then turned west, and then down a road that turned into Warden Camp again. And then he went on down that road."

Witness stated that the next time she saw the defendant was the next day in jail; that she, Tommy Stephens and Sharon Vaughn identified the defendant as the man who felt of her breast, knee and tried to get his hand up her dress.

There was much cross-examination as to the physical layout of an old and new highway nearby, where houses were situated, etc., but witness did not deviate from her testimony on direct examination. She did state that the defendant was dressed in overalls and wore a khaki shirt, and was wearing a hat, but she did not notice his shoes.

On re-direct examination witness testified:

"Q. When you went down to the police station to see a man, was there any particular reason for your thinking that Lewis Davis was the man? A. Yes, sir.

"Q. What? A. He had a scar under his chin; and his skin had bumps on his face.

"Q. Did you notice his hands? A. Yes, sir, he had one finger off, on the right hand."

Sharon Vaughn testified that she was eleven years old at the time of the trial; that on May 20, 1952 she and Tommy Ste-

phens were with Patsy Sue Shaffer at the culvert fishing, and saw a man walking south along the road where the culvert was, that he did not stop then, but returned later and stopped and talked to them; that they were all on the east side of the road when he stopped there; that she got a good look at him. She said that he was the same man she saw the next morning at the jail. She identified defendant as the man she was testifying about. She further testified:

"Q. Sharon, how long did you stay on the east side, fishing with Patsy Sue? A. After he jumped down there we were there about five minutes. After he was down on the slab with us. And then we went on the other side.

"Q. What did you do on the other side? A. Fishing."

Sharon stated that when the defendant was baiting Patsy Sue's hook that he had a finger off his right hand. Witness further testified:

"Q. Did you hear Patsy Sue scream? A. Yes.

"Q. Where were you at that time? A. I was on the other side of the culvert.

"Q. What did you do then? A. Me and Tommy were fishing. Oh, you mean when we heard her scream? Well, as soon as we heard her scream, me and Tommy got up there as fast as we could. We saw this man jump over the culvert. He was about running. You might as well said he was.

"Q. Which direction did he go? A. He went down the old pavement toward Warden Camp. And he turned off at Warden Camp. I don't know which direction you would say it was."

The attorneys for the defendant drew a diagram showing Highway 75, Flournoy's garage, the old road and culvert and cross-examined Sharon extensively as to the physical layout of roads and houses near the culvert, but her testimony corroborated that of Patsy Sue, except she did not remember whether defendant had on a hat or not, and did not think that he did.

Further, there were some minor discrepancies in the testimony of the two witnesses, as has been observed and as pointed out by counsel for the defendant, the greatest divergence being that Patsy Sue said that Sharon and Tommy were on the opposite side of the road when the defendant returned from the grocery store, but later returned to her side of the embankment while the man was helping her untangle her line. Sharon Vaughn testified that they were all on the east side of the road together when the man returned and that she and Tommy later went over to the other side, and returned only when they heard Patsy Sue scream.

Don Stormont, a deputy sheriff at Henryetta, testified that the case was first reported to him by Patsy Sue's father, Mr. Shaffer, about 5 or 6 o'clock the evening of May 20, 1952; that he made the investigation by talking with the children involved and got a description of the man; that he then started looking for a man about 35 or 40 years old, rather heavy, with a round face, dressed in blue overalls and a khaki shirt, with a finger off his right hand; that he arrested the defendant Lewis Davis the next morning at a place known as "Junction Tavern", about a mile from Henryetta; that after he placed the defendant under arrest he had the children come in and look at him, and they all said he was the man. Witness further testified, "After the children had said he was the man, I said, 'You heard what they said'. He said, 'I went along that road to the store. Saw the little girl and boy fishing. But I never did see the larger girl'".

Mrs. Joe Ferrero testified that she lived in Warden Camp; that about 5 o'clock on May 20th she was in her living room and her attention was attracted to the outside by a noise, and she saw a man walking rather fast down the road, more or less dragging his feet; that he was of medium build and had on some khaki clothes and dark trousers. She said, "Specifically, I don't remember anything else. Because it was only a fleeting glimpse. He was walking fast."

This concluded the evidence for the State, and the defendant interposed a demurrer, which was overruled with an exception noted.

Testifying for the defendant, Mrs. Alpha Lou Zuniga, stated that she was defendant's sister-in-law, her sister being his wife. At the time of the incident in question she said she lived north and just a little east of the culvert testified about; that her sister and the defendant came to her home for a visit some time between 3:30 and 4 o'clock in the afternoon of May 20th; that they sat and visited until around 5 o'clock, at which time the defendant left and went to the store to get some groceries; that she and her sister sat on the back porch, facing the south, and could see the defendant until he had passed the place where the children were supposedly playing, and that she then went into the house to make coffee; that defendant was not gone more than twenty minutes; that he did not appear to have been running or out of breath when he returned; that she did not see any children playing near the road; that she did not see the defendant leave the road or stop to talk to any one.

On cross-examination witness admitted that there was a hole of water on the east side of the culvert, and that on the north side of the hole of water there was a good sized embankment. She admitted the children could have been down in there and it would have been possible that she could not have seen them from her home.

When asked if she saw the defendant coming back from the store on this same trail on which he had left from her house, she said, "No, sir. I didn't see him until he was on that road, when I went in the house to make coffee."

Pearl Davis, wife of the defendant, testified that on May 20, 1952 she and her husband came by bus from Bokoshe to see her sister, Mrs. Zuniga, who lived at Spelter City; that they got off the bus at the junction near Spelter City about 3 o'clock that afternoon and went from the bus to her sister's home; that some time between 4:30 and 5 o'clock her husband left her sister's house to go to the grocery store; that she and her sister were sitting on the back porch when he left, and she could see him as he passed the place where the children were supposedly fishing; that she saw him on his way back from the grocery store, and when he got to the place where the dirt road intersects with the old highway she went into the house where her sister was. She said she did not know exactly how long it was after she had gone into the house before her husband came in, but it was just a few minutes; that he did not appear to have been running or out of breath when he arrived; that she did not notice any children playing along the road or near the culvert.

Witness further testified that when she and her husband arrived on the bus that afternoon he had on khaki pants and khaki shirt, and a brown hat and shoes; that he always wore a hat; that he was dressed then the same as he was dressed during the trial.

The defendant, Lewis Davis, testified in his own behalf. He stated that he and his wife arrived in Spelter City on the bus about 3:30 P.M., on May 20th for a visit with his wife's sister; that shortly after he arrived at her home, he went to the store to get some groceries; that the grocery store was located southwest of her house, on the highway coming out of Henryetta; that his wife and sister-in-law were out in the back yard when he left to get the groceries; that he returned over the same route he had traveled in going to the store; that he didn't stop along the road to talk to any one, and did not see these girls there that afternoon. He said: "If they were there, I didn't see them". When asked how he was dressed that afternoon, he said, "Just as I am right now". He said that he was wearing a hat.

Defendant testified that the next morning he went down to the beer joint at the "Y" to get a beer and Don Stormont came in and arrested him and put him in the city jail at Henryetta; that it was about 8 o'clock in the morning when he was thrown in jail; that there were 4 or 5 drunk Indians in the jail at that time; that later that morning Stormont brought the two little girls and the little boy to the jail to identify him. He said he had never seen these children before in his life. He testified that he had

served four sentences in the penitentiary, for murder and burglary, but had never before been charged with a sex offense.

On cross-examination the county attorney asked him if he didn't tell Mr. Stormont the next morning that he saw the little boy and the little girl that afternoon over on the west side of the road, but did not see the other little girl over on the east side. His answer was, "I don't know about that".

When asked how he was dressed on the morning of the arrest, defendant said he was wearing a pair of blue coveralls that afternoon when he went to the grocery store. He said, "I had on what I have on now". He was then interrogated about the different felony convictions.

It is argued by counsel for the defendant that the testimony of the prosecutrix was uncertain and unconvincing and that there was a conflict in a number of respects between her testimony and that of Sharon Vaughn, her playmate, and that the testimony of the prosecutrix was not sufficiently corroborated.

Counsel says:

"The crime charged is so reprehensible that, no matter how innocent a man may be, it is almost impossible for him to get a fair and impartial trial before an unbiased jury. And, especially is this true where the defendant has a prior criminal record. * * * It is unbelievable to the ordinary layman that a child would concoct such a story unless the same was true. However, courts and attorneys have had ample opportunity to learn that such stories of being molested are often untrue. And for this reason the evidence to sustain a conviction of a charge of this nature should be clear and convincing."

These observations are, in the opinion of this court, sound, and demand particular caution and deliberation.

While we do not find that this court has ever determined that the rule prescribed in rape cases and other sexual crimes specifying when corroboration would be necessary, and announced in Johnson v. State, 84 Okl.Cr. 368, 182 P.2d 777; Gullatt v. State, 80 Okl.Cr. 208, 158 P.2d 353; and re-stated in Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160, 161, we believe that such rule should apply to the section of the statute here involved, Tit. 21 O.S.A. § 1123, as well as in a rape case. In the Louis case we said:

"While it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the prosecutrix, it is nevertheless equally well settled that, when such evidence is inherently improbable and almost incredible, there must be corroboration by other evidence as to the principal facts to sustain conviction.

"In prosecution for rape, appellate court will make careful examination of whole record to end that it may justify sentence imposed notwithstanding general rule that, where there is any evidence to support verdict or where evidence is conflicting, appellate court will not examine record to ascertain or determine weight of such evidence, and verdict approved by trial judge will be permitted to stand."

Was the testimony of Patsy Sue Shaffer inherently improbable? From a study of the entire record we think not. Here the defendant and his witnesses admit that defendant passed by the culvert about the time testified to to get groceries and did get groceries and returned the same way he travelled in going to the grocery store. There is a vast difference in the chance a sex offender would take in undertaking the rape of a female, and the chance such person with abnormal propensities might take in the matter of feeling of the person of a female, particularly if he could do it with her consent. Here the child Patsy Sue was positive in her statement of the manner of approach used by the defendant in an apparent attempt to gain her confidence and ordinarily if he had not been a stranger to the little girl would not have appeared out of the way. Sharon Vaughn corroborated in detail the conduct of the defendant as related by Patsy Sue up to the time that she and the little boy decided to fish on the opposite side of the embankment. Then she and the boy heard Patsy Sue

screaming and they rushed up the bank to see the defendant jump over the culvert. "He was about running. You might as well said he was." She further stated, "I could never forget his face." And she stated that they told her parents that he had a finger off. They watched where defendant went, which was in the direction of the Zuniga place from the further descriptions.

The method of ingratiating himself with the child by wanting to see her fish and then offering to help untangle her line and bait her hook, all corroborated by Sharon Vaughn, was not such overt conduct even though such attention was forced on the child, as to cause her to scream out. In his apparent efforts to help her with her fishing he was placed in close proximity to her. When the other children crossed over the bank, if he possessed the propensity charged, he had opportunity to advance his purpose. The child said that he pinched her on the right breast and remarked that she "sure had a big one." She agreed, but did not scream out. Thus encouraged he felt of her knee and then offered the child money to be allowed to put his hand up under her dress. He wanted her consent, which was necessary to not be detected, but she then really became alarmed and screamed out.

Under the circumstances related, the nearness of highways and homes, it would have been improbable that a man would have attempted to rape a child. But rape is one thing, and feeling of the person another. The cases are too numerous where abnormal persons get great satisfaction even in such public places as theatres, of feeling of the person of small boys and girls. No doubt most children move away or out of reach where they do not submit for favors promised, to such action of the pervert, and do not scream. Only in a small percentage of the cases where the pervert persists, do they scream. So the pervert feels his way and takes the chance. The pattern in this case follows that in the case histories of such crimes.

While the defendant admitted passing the culvert about the time stated, he claimed that he never saw any children, but according to the testimony of deputy sheriff Stormont he admitted to him that he saw the smaller girl and boy playing at the culvert but did not see the larger girl. Defendant would not positively deny that he made such statement to the deputy. Defendant's only answer was, "I don't know about that."

While the evidence refutes the idea that the defendant actually felt of the child's private parts as alleged, he did make such proposal according to the testimony of the child, and did feel of her private person as already recited, all of which violates the statute heretofore quoted.

We conclude that the testimony of the prosecutrix was not inherently improbable or almost incredible, and we find too many corroborative circumstances of the preliminary activities of the defendant to say that there was not sufficient evidence for the submission of the case to the jury.

It was the duty of the jury to weigh the evidence of the various witnesses for the State and for the defendant. The jury might have believed the witnesses for the defendant and held for him, but they did not. And we have often said that the jury's findings as to the guilt of a defendant will not be reversed where there is competent evidence in the record, together with the reasonable inferences and deductions to be drawn therefrom supporting the jury's verdict. Edwards v. State, 87 Okl.Cr. 399, 198 P.2d 656; Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479; Spears v. State, 89 Okl.Cr. 361, 207 P.2d 946.

It must be remembered that on cross-examination the defendant admitted four previous convictions for felonies. The court correctly advised the jury that "such previous convictions can be considered by you only to affect the credibility of the defendant as a witness; and cannot be considered as a fact establishing his guilt of the crime charged."

We therefore find that the trial court did not err in overruling the demurrers of the defendant and motion for a directed verdict.

Concerning the alleged misconduct of the county attorney in the cross-examination of the defendant, the record discloses that the county attorney questioned the defendant as

to previous convictions. The defendant stated that he had been convicted four times. The county attorney held in his hand an F.B.I. record of the defendant's previous convictions for crime, and asked the defendant if it was not a fact that he had been convicted five times previously, and proceeded to ask him:

"Q. Didn't you do two stretches for murder? One of twelve years and one of three, running concurrently, in the State Penitentiary at McAlester? A. That was in '39 or '45?

"Q. And this '29 conviction was on burglary? A. Yeah.

"Q. '35 on larceny? A. Yes.

"Q. '39 was on murder? A. That other one was a Federal charge. Federal run concurrently with * * *."

At this point counsel for the defendant interrupted the witness and interposed the following objection: "Comes now the defendant, and moves the court to declare a mistrial in this case, for the reason that the county attorney of this county is exhibiting a 'rap sheet' in the presence of the jury, which is several pages in length; that cross-examining the witness by referring to that 'rap sheet'".

The court overruled the objection but suggested to the county attorney to put away the record that he was referring to, which he did.

It is our conclusion that the questioning by the county attorney was proper as bearing on the credence the jury might give to the testimony of the defendant. The county attorney had a right to refer to memorandum for dates, nature of past convictions, etc., where there might be a discrepancy in the testimony of the witness and the record of past convictions. The county attorney did not in the presence of the jury refer to his memorandum as a "rap sheet" or seek to give to his memorandum any special weight or significance, but apparently used it only as a matter of convenience in getting to the facts.

The final complaint is that the assistant county attorney made certain prejudicial remarks to the jury in his closing argument that requires the reversal of this case. The remarks were made by Mr. Richeson, and are reported as follows:

"You have heard the testimony in this case, and you alone are the judges, not only of the evidence, the testimony, but of the credibility of these witnesses. They have sat here, and you have heard what they had to say. It is up to you to decide one way or the other whether Lewis Davis is guilty; or whether he isn't. We believe that Lewis Davis is guilty of the crime charged.

"Mr. Hays: At this time, I object to the county attorney's saying, 'We believe defendant guilty of the crime as charged' and ask the court to declare a mistrial.

"The Court: Overruled.

"Mr. Hays: Exception.

"Mr. Richeson: Because of the evidence that has been presented here to you today. Let's summarize that, just a moment."

From the above record it is quite apparent that the objection interposed by defense counsel was interposed before the assistant county attorney had opportunity to complete his statement. He had only commenced his closing argument and it is evident that his remarks were only as a predicate for the summing up of the evidence, which followed. When the court overruled the objection he continued his remarks and left no doubt as to what he meant; that is, that the conclusion was based on evidence he would summarize, and not on any personal opinion.

In Sweet v. State, 68 Okl.Cr. 44, 95 P.2d 242, 243, in the fourth paragraph of the syllabus, we said:

"It is the duty of the county attorney in his opening statement and closing argument to the jury to confine himself to the facts as shown by the evidence. But they have the right to draw their deductions and conclusions, and unless the statements or arguments are such that deprive a defendant of his substantial rights, or are such that would arouse the passion and prejudice of the jury to the extent that they would be swayed from arriving at a just verdict,

the judgment and sentence will not be set aside on appeal."

By reason of what has been said, the judgment of the district court of Okmulgee County appealed from is affirmed.

JONES and BRETT, JJ., concur.